IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 09-02046 (BWB) |
|  | ) | (Jointly Administered) |
|  | ) | Chapter 11 |
| HARTMARX CORPORATION, | ) |  |
| et al., | ) | Hon. Bruce W. Black |
|  | ) |  |
| Debtors.[1] | ) | **Bidding Procedures Hearing Date: June 1, 2009 at 2:00 p.m.** |
|  | ) | **Bidding Procedures Objection Due: May 28, 2009 at 4:00 p.m.** |
|  |  | **Sale Hearing Date: July 9, 2009 at 2:00 p.m.** |
|  |  | **Sale Hearing Objection Due: July 2, 2009 at 4:00 p.m.** |

## NOTICE OF MOTION AND REQUEST FOR NON-OMNIBUS HEARING

**PLEASE TAKE NOTICE** that on **June 1, 2009, at the hour of 2:00 p.m.,** the undersigned shall appear before the Honorable Bruce W. Black, in Courtroom 615, 219 S. Dearborn Street, Chicago, Illinois, or before any other Judge sitting in his stead, and then and there present, only with respect to the approval of bidding procedures, the granting of bid protections, the approval of the form and manner of sale notices, and the setting of a sale hearing date, the **MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363, 365 AND FED. R. BANKR. P. 2002, 6004, 6006 FOR (I) ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES; (B) GRANTING CERTAIN BID PROTECTIONS; (C) APPROVING FORM AND MANNER OF**

---

[1] The Debtors consist of: Hartmarx Corporation (FEIN: 36-3217140); Anniston Sportswear Corporation (FEIN: 63-0255951); Briar, Inc. (FEIN: 36-3295194); Chicago Trouser Company, Ltd. (FEIN: 36-3654087); C.M. Clothing, Inc. (FEIN: 62-0726470); C.M. Outlet Corp. (FEIN: 23-2079484); Consolidated Apparel Group, Inc. (FEIN: 36-4451205); Country Miss. Inc. (FEIN: 23-2159300); Country Suburbans, Inc. (FEIN: 13-2536025); Direct Route Marketing Corporation (FEIN: 36-3353564); E-Town Sportswear Corporation (FEIN: 35-1045839); Fairwood-Wells, Inc. (FEIN: 36-2793207); Gleneagles, Inc. (FEIN: 52-0382880); Handmacher Fashions Factory Outlet, Inc. (FEIN: 62-0699057); Handmacher-Vogel, Inc. (FEIN: 13-2522868); Hart Services, Inc. (FEIN: 36-3119791); Hart Schaffner & Marx (FEIN: 36-1196390); Hartmarx International, Inc. (FEIN: 36-3849547); Hickey-Freeman Co., Inc. (FEIN: 05-0522438); Higgins, Frank & Hill, Inc. (FEIN: 36-3119788); HMX Luxury, Inc. (FEIN: 36-3432123); HMX Sportswear, Inc. (FEIN: 13-2882518); Hoosier Factories, Incorporated (FEIN: 35-1103970); HSM Real Estate LLC (FEIN: 36-4421906); HSM University, Inc. (FEIN: 36-3635288); Intercontinental Apparel, Inc. (FEIN: 22-2268615); International Women's Apparel, Inc. (FEIN: 74-1312494); Jaymar-Ruby, Inc. (FEIN: 35-0392340); JRSS, Inc. (FEIN: 35-1695663); Kuppenheimer Men's Clothiers Dadeville, Inc. (FEIN: 63-0179270); Monarchy Group, Inc. (FEIN: 26-0472040); National Clothing Company, Inc. (FEIN: 13-3056089); NYC Sweaters, Inc. (FEIN: 20-5399484); 106 Real Estate Corp. (FEIN: 23-1609394); Robert's International Corporation (FEIN: 36-3671895); Robert Surrey, Inc. (FEIN: 36-6163392); Salhold, Inc. (FEIN: 36-3806997); Seaford Clothing Co. (FEIN: 36-1692913); Simply Blue Apparel, Inc. (FEIN: 20-3583172); Society Brand, Ltd. (FEIN: 36-6114108); Sweater.com Apparel, Inc. (FEIN: 20-5300452); Tag Licensing, Inc. (FEIN: 36-2876915); Tailored Trend, Inc. (FEIN: 13-1540282); Thorngate Uniforms, Inc. (FEIN: 23-1007260); Thos. Heath Clothes, Inc. (FEIN: 36-6114533); Trade Finance International Limited (FEIN: 36-3758253); Universal Design Group, Ltd. (FEIN: 36-3758257); M. Wile & Company, Inc. (FEIN: 16-0959019); Winchester Clothing Company (FEIN: 61-0983980); Yorke Shirt Corporation (FEIN: 36-3440608); Zooey Apparel, Inc. (FEIN: 20-5917889).

**SALE NOTICES; (D) SETTING SALE HEARING DATE IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) THE ASSUMPTION OF CERTAIN LIABILITIES; (D) AUTHORIZING THE TERMINATION OR REJECTION OF CERTAIN EXECUTORY CONTRACTS; AND (E) GRANTING CERTAIN RELATED RELIEF** (the "<u>Motion</u>") at which time you may appear if you see fit and a copy of which is attached and herewith served upon you.

The Debtors have requested that the Motion be heard at a non-omnibus hearing date.

Dated: Chicago, Illinois
May 21, 2009

　　　　　　　　　　　　　　　　　 _/s/ George N. Panagakis_
　　　　　　　　　　　　　　　　　 George N. Panagakis (ARDC #620527 1)
　　　　　　　　　　　　　　　　　 Felicia Gerber Perlman (ARDC #062 10753)
　　　　　　　　　　　　　　　　　 Eric J. Howe (ARDC #6291643)
　　　　　　　　　　　　　　　　　 SKADDEN, ARPS, SLATE, MEAGHER
　　　　　　　　　　　　　　　　　　 & FLOM LLP
　　　　　　　　　　　　　　　　　 333 West Wacker Drive, Suite 2100
　　　　　　　　　　　　　　　　　 Chicago, Illinois 60606-1285
　　　　　　　　　　　　　　　　　 Telephone: (312) 407-0700

　　　　　　　　　　　　　　　　　 Attorneys for Debtors and Debtors-in-
　　　　　　　　　　　　　　　　　 Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 09-02046 (BWB) |
| | ) | (Jointly Administered) |
| | ) | Chapter 11 |
| HARTMARX CORPORATION, | ) | |
| et al., | ) | Hon. Bruce W. Black |
| | ) | |
| Debtors.[2] | ) | **Bidding Procedures Hearing Date: June 1, 2009 at 2:00 p.m.** |
| | ) | **Bidding Procedures Objection Due: May 28, 2009 at 4:00 p.m.** |
| | | **Sale Hearing Date: July 9, 2009 at 2:00 p.m.** |
| | | **Sale Hearing Objection Due: July 2, 2009 at 4:00 p.m.** |

**MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365 AND FED. R. BANKR. P. 2002, 6004, 6006 FOR (I) ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES; (B) GRANTING CERTAIN BID PROTECTIONS;(C) APPROVING FORM AND MANNER OF SALE NOTICES; (D) SETTING SALE HEARING DATE IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) THE ASSUMPTION OF CERTAIN LIABILITIES; (D) AUTHORIZING THE TERMINATION OR REJECTION OF CERTAIN EXECUTORY CONTRACTS; AND (E) GRANTING CERTAIN RELATED RELIEF**

---

[2]   The Debtors consist of: Hartmarx Corporation (FEIN: 36-3217140); Anniston Sportswear Corporation (FEIN: 63-0255951); Briar, Inc. (FEIN: 36-3295194); Chicago Trouser Company, Ltd. (FEIN: 36-3654087); C.M. Clothing, Inc. (FEIN: 62-0726470); C.M. Outlet Corp. (FEIN: 23-2079484); Consolidated Apparel Group, Inc. (FEIN: 36-4451205); Country Miss. Inc. (FEIN: 23-2159300); Country Suburbans, Inc. (FEIN: 13-2536025); Direct Route Marketing Corporation (FEIN: 36-3353564); E-Town Sportswear Corporation (FEIN: 35-1045839); Fairwood-Wells, Inc. (FEIN: 36-2793207); Gleneagles, Inc. (FEIN: 52-0382880); Handmacher Fashions Factory Outlet, Inc. (FEIN: 62-0699057); Handmacher-Vogel, Inc. (FEIN: 13-2522868); Hart Services, Inc. (FEIN: 36-3119791); Hart Schaffner & Marx (FEIN: 36-1196390); Hartmarx International, Inc. (FEIN: 36-3849547); Hickey-Freeman Co., Inc. (FEIN: 05-0522438); Higgins, Frank & Hill, Inc. (FEIN: 36-3119788); HMX Luxury, Inc. (FEIN: 36-3432123); HMX Sportswear, Inc. (FEIN: 13-2882518); Hoosier Factories, Incorporated (FEIN: 35-1103970); HSM Real Estate LLC (FEIN: 36-4421906); HSM University, Inc. (FEIN: 36-3635288); Intercontinental Apparel, Inc. (FEIN: 22-2268615); International Women's Apparel, Inc. (FEIN: 74-1312494); Jaymar-Ruby, Inc. (FEIN: 35-0392340); JRSS, Inc. (FEIN: 35-1695663); Kuppenheimer Men's Clothiers Dadeville, Inc. (FEIN: 63-0179270); Monarchy Group, Inc. (FEIN: 26-0472040); National Clothing Company, Inc. (FEIN: 13-3056089); NYC Sweaters, Inc. (FEIN: 20-5399484); 106 Real Estate Corp. (FEIN: 23-1609394); Robert's International Corporation (FEIN: 36-3671895); Robert Surrey, Inc. (FEIN: 36-6163392); Salhold, Inc. (FEIN: 36-3806997); Seaford Clothing Co. (FEIN: 36-1692913); Simply Blue Apparel, Inc. (FEIN: 20-3583172); Society Brand, Ltd. (FEIN: 36-6114108); Sweater.com Apparel, Inc. (FEIN: 20-5300452); Tag Licensing, Inc. (FEIN: 36-2876915); Tailored Trend, Inc. (FEIN: 13-1540282); Thorngate Uniforms, Inc. (FEIN: 23-1007260); Thos. Heath Clothes, Inc. (FEIN: 36-6114533); Trade Finance International Limited (FEIN: 36-3758253); Universal Design Group, Ltd. (FEIN: 36-3758257); M. Wile & Company, Inc. (FEIN: 16-0959019); Winchester Clothing Company (FEIN: 61-0983980); Yorke Shirt Corporation (FEIN: 36-3440608); Zooey Apparel, Inc. (FEIN: 20-5917889).

Hartmarx Corporation ("Hartmarx" or the "Company") and 50 of its subsidiaries, debtors and debtors-in-possession (collectively, the "Debtors") hereby move (the "Motion") this Court for entry of orders (i) (a) approving the bidding procedures attached to the Bidding Procedures Order (as defined herein) as Exhibit 1 (the "Bidding Procedures"), (b) granting certain bid protections, (c) approving the form and manner of sale notices (the "Notice Procedures"), and (d) setting a date for the sale hearing (the "Sale Hearing") and (ii) authorizing and approving (a) the sale (the "Sale") of substantially all of the Debtors' assets (the "Acquired Assets") to Emerisque Brands UK Limited ("Emerisque") and SKNL North America, B.V. (collectively, the "Purchasers") in accordance with that certain Asset Purchase Agreement dated May 21, 2009 by and among Hartmarx and certain of its subsidiaries (collectively, the "Sellers")[3] and the Purchasers, (the "Agreement") or the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, (b) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and collectively with the Assumed Contracts, the "Assigned Contracts") to the Purchasers or the Successful Bidder, as the case may be, (c) the assumption of certain liabilities (the "Assumed Liabilities") by the Purchasers or the Successful Bidder, as the case may be, (d) the termination or rejection, without any rights retained by the counterparties, of (x) that certain Pierre Cardin Technology Transfer Agreement, dated on or about March 28, 2008, by and among Intercontinental Apparel, Inc., Hartmarx International, Inc. ("International"), S.A.R.L. De

---

[3]   One of the Sellers under the Agreement is Coppley Apparel Group Limited ("Coppley"), which is a non-Debtor Canadian subsidiary of Hartmarx.  Accordingly, the assets of Coppley (the "Coppley Assets") are not assets of the Debtors' bankruptcy estates, and the Sale Approval Order will not apply to the transfer of such assets to the Purchasers.  Instead, pursuant to the Agreement, the Sellers and the Purchasers will amend the Agreement within ten days to provide a mutually acceptable Canadian sale process in which an appropriate Canadian court would approve the transfer of the Coppley Assets to the Purchasers free and clear of all liens, claims, encumbrances, and interests.

Gestion Pierre Cardin, and The Arvind Mills Limited ("Arvind"), and all ancillary agreements related thereto, (y) that certain Sansabelt Technology Transfer Agreement, dated on or about March 28, 2008, by and among Jaymar-Ruby, Inc. dba HMX Tailored, International, and Arvind, and all ancillary agreements related thereto, and (z) that certain Hart Schaffner Marx Technology Transfer Agreement, dated on or about March 14, 2008, by and among Hart Schaffner & Marx, International, and Arvind, and all ancillary agreements related thereto (collectively, the "Rejected Contracts"), and (e) granting certain related relief.  In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## BACKGROUND

1.      On January 23, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. This Court has ordered joint administration of these chapter 11 cases (the "Chapter 11 Cases").

2.      On January 30, 2009, the Office of the United States Trustee for the Northern District of Illinois appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these Chapter 11 Cases.

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are Bankruptcy Code sections  105(a), 363, 365 and Bankruptcy Rules 2002, 6004, and 6006.

3

A.      **Background and Current Business Operations**

5.      Founded in 1872, the Company, whose stock is publicly traded, is headquartered in Chicago, Illinois and operates exclusively in the apparel business.  It is among the largest manufacturers and marketers for men's suits and sport coats in the United States.  It also manufactures and markets casual pants, men's and women's sportswear, including golfwear, shirts, ties and women's apparel.

6.      Effective as of August 30, 2002, the Company entered into a $200 million senior revolving credit facility (the "Prepetition Credit Facility") pursuant to that certain Loan and Security Agreement (as amended, the "Prepetition Credit Agreement"), between, among others, Hartmarx and Congress Financial Corporation (Central), predecessor-in-interest to Wachovia Capital Finance Corporation (Central), as agent (the "Prepetition Agent") for the lenders (the "Prepetition Secured Lenders").  As of the Petition Date, the Company's only other long-term debt consisted of two industrial development bond issuances totaling approximately $15.5 million and mortgages on two of its owned manufacturing facilities with approximately $12.5 million of total principal owing under those mortgages.  In addition, it had approximately $70 million of trade debt and approximately 39,000,000 shares of common stock issued and outstanding.  The Company has approximately $500 million in annual sales.

7.      Due in part to changing trends in the clothing market, revenues have dropped over the past few years as demand for the Company's products, particularly moderate price tailored products, has decreased.  The current difficult retail environment, which has led to a further slow down in consumer spending, has exacerbated the problem.  In addition, during the weeks prior to the Petition Date, the Prepetition Agent lowered the advance rates on borrowings against collateralized inventory and increased the amount of its reserves on the Company's inventory and receivables, resulting in a decrease in its borrowing availability under the

4

Prepetition Credit Facility.  Together, these factors left the Company without adequate cash to meet its day to day operating needs, and the Company was forced to commence these Chapter 11 Cases.

**B.      The Debtors' Marketing and Sales Efforts**

8.      The Debtors, with the assistance of their advisors, have been actively marketing the sale of substantially all of their assets for the last five months.  Even before the Petition Date, the Debtors engaged in discussions with a variety of financial and strategic planners in an effort to maximize the value of the Acquired Assets.

9.      Prior to the commencement of these Chapter 11 Cases, the Company retained Moelis and Company LLC ("Moelis") to act in an advisory capacity to evaluate strategic alternatives.  As part of this evaluation, the Company and Moelis have aggressively pursued a potential sale of the Acquired Assets.  The Company and Moelis undertook exhaustive efforts to solicit interest in the Company from third parties with the potential to acquire all or a substantial portion of the Acquired Assets.

10.      At the outset of this process, the Debtors determined, in consultation with their advisors, the Creditors' Committee, and DIP Lenders, to focus sales efforts on locating a stalking horse bidder for substantially all of their assets.  While the Debtors and their advisors received inquiries from, and expended some effort in responding to, parties interested in acquiring less than all of the Debtors' assets, most of the Debtors' time and energy were spent forwarding the information gathering and discussions with those parties who expressed an interest in acquiring the Debtors' assets as a whole.  Among the various reasons that the Debtors (with frequent input from their advisors, the Creditors' Committee, and the DIP Lenders) have chosen to concentrate their efforts on securing bidders for all of the Debtors assets are the substantial wind-down expenses associated with the shut down of any of the business units.  A

5

bid for acquisition of the Debtors' assets as a whole saves these costs. These savings can be made available to the Debtors by such bidders as consideration and thus the Debtors believe that a sale process that includes a sale of substantially all of the Acquired Assets will most likely maximize value to the estates.

11.    Between the Petition Date and mid-April 2009, the Company and Moelis identified and contacted approximately 154 potential financial and strategic counterparties. Approximately 67 of these parties received a confidential information memorandum detailing the operations and finances of the Company. Of these, twelve parties submitted initial indications of interest to acquire all of the Acquired Assets of the Company.[4] Many parties were provided extensive due diligence materials on an electronic data site (the "Data Site"), and seven parties were given the opportunity to speak with the Company and its advisors and to conduct site visits with respect to the Acquired Assets. Three of these parties (two private equity firms and a strategic investor) submitted preliminary offers and/or term sheets for various types of proposed transactions.

12.    These three preliminary proposals have been the basis for extensive discussions and negotiations with the Company, ongoing diligence and discussions with management, and visits to the Debtors' facilities. The Debtors have pursued, and continue to pursue, potential transactions with all three parties. However, ultimately, based upon various factors described below, including the increase in consideration offered by Emerisque through active negotiations regarding the terms and conditions of the Agreement, on May 21, 2009, the Debtors executed the Agreement with the Purchasers for the purchase of the Acquired Assets for the aggregate price of $85.5 million, subject to certain adjustments described more fully below,

---

[4]    As noted above, Moelis and the Company have also been contacted by various parties expressing interest in acquiring only specific brands or businesses.

plus the assumption of certain liabilities, including certain cure costs and postpetition administrative expenses, which liabilities the Debtors estimate to be no less than $33.5 million. Emerisque is a specialist private investment firm based in London, United Kingdom which focuses its investments on turnaround opportunities in under-performing European and US consumer goods brands. Emerisque has previously been central to the successful turnarounds of brands of such companies as Puma, Ben Sherman, and Lee Cooper, among others.

13.    At this juncture, Emerisque's bid is the most well-developed of the remaining bids. The other parties are still completing diligence efforts and performing other analyses with respect to their proposals, and the Debtors are committed to continuing to work with these bidders to bring their bids to fruition. However, at this point, Emerisque represents the most advanced of the bids, and, as a bidder for substantially all of the assets of the Debtors, provides the best platform from which a successful and value-maximizing auction and ultimate sale might take place.

14.    To that end, now that the Debtors have concluded negotiations with the Purchasers as potential stalking horse bidders (subject to approval by this Court), the Debtors have begun to (and plan to continue to) focus more attention, time, and energy on bidders with continuing interest in substantial segments of the Debtors' assets in order to pursue the possibility that value may be maximized through a piecemeal sale of the Debtors' assets at an Auction. In addition, the Debtors have provided diligence access to several leading liquidation firms to ensure that bid levels exceed those available through a liquidation.

15.    Because of various factors, including the seasonality of the Debtors' business operations, the requirements for the Debtors' maintenance of its debtor-in-possession financing, and the Purchasers' desire not to unnecessarily tie up capital or risk of losing other business opportunities, the Debtors have proposed to move forward with the sale process on an

expedited basis and within a specified time frame.  Consequently, the Debtors have determined

that it is in the best interest of their estates, creditors, and other parties in interest to move

forward with the Sale process set forth herein.

16.    Accordingly, the Debtors have proposed the following timeline for the

Sale of the Acquired Assets: [5]

- June 1, 2009 – Bidding Procedures Hearing

- June 11, 2009 – Initial Indication Deadline (as defined in the Bidding
  Procedures)

- June 25, 2009 – Submission Deadline for Qualified Bids (defined below)

- June 30, 2009 – Auction

- July 9, 2009 – Proposed Sale Hearing

## C.    The Asset Purchase Agreement

17.    A summary of the principal terms of the Agreement, set forth in full in the

Agreement, is as follows:[6]

- Consideration.  Cash in the amount of $70.5 million, and a junior subordinated
  secured note in the principal amount of not less than $15 million, adjusted as
  described below.

- Adjustments to Consideration.  The Cash Purchase Price will be subject to adjustment
  immediately prior to the Closing as follows: (i) if the Closing Borrowing Base is less
  than the Estimated Borrowing Base, the Cash Purchase Price shall be decreased by an
  amount equal to such difference, and the Cash Purchase Price, as so adjusted, will be
  the Adjusted Cash Purchase Price; provided, however, that if the Adjusted Cash
  Purchase Price under this Section is less than $60.5 million, the principal amount of
  the Junior Secured Note shall be increased such that the sum of the Adjusted Cash

---

[5]    The Debtors, in the exercise of their business judgment, reserve their right to change these sale-related dates in
order to achieve the maximum value for the Acquired Assets, while cognizant of the deadlines set forth in the
Agreement.

[6]    The following summary is qualified in its entirety by reference to the provisions of the Agreement.  In the event
of any inconsistencies between the provisions of the Agreement and the terms herein, the terms of the
Agreement shall govern.  Unless otherwise defined in the summary set forth in the accompanying text,
capitalized terms shall have the meanings assigned to such terms in the Agreement.

Purchase Price and the principal amount of the Junior Secured Note equals $75.5 million; (ii) if the Closing Borrowing Base is greater than the Estimated Borrowing Base, the Cash Purchase Price shall be increased by an amount equal to such difference, up to an increase of $3 million, and the Cash Purchase Price, as so adjusted, will be the Adjusted Cash Purchase Price; and (iii) if the Closing Borrowing Base is equal to the Estimated Borrowing Base, the Cash Purchase Price will be the Adjusted Cash Purchase Price.

- <u>Payment of cure costs and certain Administrative Expenses</u>.  Purchasers agree to assume certain liabilities of the Debtors, including, among other things, amounts required to pay all cure costs and certain other administrative expense claims, which the Debtors estimate to be no less than $33.5 million.

- <u>Acquired Assets</u>. Substantially all of the assets of Hartmarx Corporation and its subsidiaries.

- <u>Representations and Warranties</u>.  Representations and warranties do not survive the closing; and there is no post-closing indemnity for breaches.

- <u>Operations Pending Closing</u> Until the closing, the Debtors are subject to covenants limiting their operating flexibility in certain respects and are generally required to carry on their business in the ordinary course, taking into account their status as debtors-in-possession.

- <u>Termination to Pursue Higher or Better Offer</u>. Debtors may, upon paying Purchasers a $1,650,000 break-up fee and reimbursing Purchasers' transaction expenses of $2 million, which will have superpriority administrative expense, terminate the Agreement to consummate a competing sale transaction or undertake a stand alone restructuring. Purchasers' right to the break-up fee or expense reimbursement is subject to the delivery by Purchasers to Sellers of all Financing Commitment Letters related to the financing available to the Purchasers to fund the purchase of the Acquired Assets.

- <u>Purchaser Termination Fee</u>.  Purchasers will be required to pay the Debtors an amount in cash equal to $4 million if the Agreement is terminated under certain circumstances.

- <u>Represented Employees</u>. Purchasers will offer employment to a substantial number of the employees who are subject to current or expired Collective Bargaining Agreements governing such employees at the (i) Des Plaines, IL and (ii) Rochester, NY facilities, and who have been working on a full-time basis since July 1, 2008 (collectively, the "<u>Hired Represented Employees</u>"). If Purchasers assume the Collective Bargaining Agreements applicable to the Hired Represented Employees, such offer of employment shall be upon the terms and conditions set forth in such Collective Bargaining Agreements. If Purchasers do not assume the Collective Bargaining Agreements applicable to the Hired Represented Employees, such offer of employment shall include (i) wages similar to those the Hired Represented Employees were paid by Sellers as of January 1, 2009; (ii) the same health and welfare benefit package that Purchasers offer to Non-Represented Hired Employees; and other terms of employment that Purchasers shall establish. If Purchasers do not assume the Collective Bargaining Agreements applicable to the Hired Representative

9

Employees, Purchasers shall have no responsibility for any obligations or liabilities arising under the Collective Bargaining Agreements or any other Contract affecting such Hired Represented Employees.

- <u>Non-Represented Employees</u>.  On or before the Closing Date, but effective as of the day following the Closing Date, Purchasers will offer employment to a substantial number of the employees who are not subject to current or expired Collective Bargaining Agreements, on such terms and conditions as the Purchasers and such employees agree to prior to the Closing Date. Purchasers shall have no other liabilities with respect to such employees except as specifically set forth in the Agreement.

### **RELIEF REQUESTED**

18.     The Debtors have determined that given their liquidity, current market conditions, and the condition of the retail environment, a prompt Sale of the Acquired Assets is the best way to maximize the value of the Acquired Assets for their respective estates and creditors.

19.     Accordingly, by this Motion, the Debtors seek approval for the sale of the Acquired Assets to the Purchasers, subject to additional competitive bidding pursuant to the proposed Bidding Procedures.  To effect the Sale, the Debtors seek two types of relief.  First, at a hearing to be held on June 1, 2009, the Selling Debtor Entities will seek entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided to the Purchasers pursuant to the Agreement, which is attached hereto as <u>Exhibit B</u>, and as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at a proposed hearing to be held on July 9, 2009, the Debtors will seek entry of an order (the "<u>Sale Approval Order</u>")[7] authorizing and approving the Sale to the Purchasers or the Successful

---

[7]  A form of the Sale Approval Order will be filed by the Debtors no later than ten days from the date of this Motion.

Bidder, as the case may be, including, without limitation, the assumption and assignment of the Assumed Contracts to the Buyer, and the assumption by the Buyer of the Assumed Liabilities.

## BASIS FOR RELIEF

20.     The events leading to these Chapter 11 Cases are well known to this Court and to the Debtors' suppliers, creditors, and other parties in interest.  In furtherance of the Debtors' duty to maximize the value of their estates, the Debtors have filed this Motion seeking approval of a Sale process, including the Bidding Procedures.

**D.     Necessity for Sale**

21.     The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue, including attempts to raise cash through various strategic transactions.  To date, none of these options has been successful.  Given current economic market conditions, including unfavorable conditions in the retail environment, the Debtors' liquidity situation has not improved.

22.     As set forth above, the Debtors presently face the possibility of continued financial deterioration.  However, the Debtors have managed to obtain necessary financing to conduct the Sale process proposed herein.  Indeed, the terms of the Debtors' postpetition debtor-in-possession financing contemplates the swift completion of a Sale process.  Thus, the Debtors have decided to pursue a Sale of all or a portion of the Acquired Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures.

E.    **The Bidding Procedures**[8]

23.    In order to maximize the value of the Acquired Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery.  As described more fully in the Bidding Procedures, the Debtors may sell all or a portion of the Acquired Assets to any bidder that makes the highest or otherwise best offer for the Acquired Assets.

24.    The following summarizes the Bidding Procedures:[9]

- Any person who wishes to participate in the bidding process must (a) become a "Qualified Bidder" and (b) submit a "Qualified Bid."

- To become a Qualified Bidder, a person must submit (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, (b) certain financial statements and other financial information, and (c) a preliminary non-binding proposal to the Debtors and their investment banker by June 11, 2009.  In addition, the Debtors must determine that such person will be able to consummate the Sale within the time frame provided by the Agreement.

- A bid submitted by a Qualified Bidder will be a Qualified Bid only if, among other things, it (a) includes the Required Bid Documents (which include, among other things, a Good Faith Deposit), (b) is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder, (c) proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Debtors determine, in their sole discretion, are similar to, and are not materially more burdensome or conditional than, the terms of the Agreement, (d) proposes a transaction that has a value greater than or equal to the All Assets Minimum Bid Amount, (e) is not conditioned on any bid protections, (f) includes certain acknowledgements and commitments, and (g) is received by the Bid Deadline.

---

[8]    Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached to the Bidding Procedures Order.

[9]    The following description of the Bidding Procedures is a summary only.  To the extent that this summary differs in any way from terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

- The Bid Deadline is 5:00 p.m. (prevailing Central time) on June 25, 2009.  The Debtors may extend the Bid Deadline once or successively, so long as the deadlines in the Agreement are not violated or the Purchasers consent, but they are not obligated to do so.

- If the Debtors receive one or more Qualified Bids, in addition to the Agreement, which the Debtors determine, in consultation with the DIP Agent and the Creditors' Committee, will provide greater value to the estate than the Agreement, the Debtors may conduct an auction (the "Auction") at 10:00 a.m. (prevailing Central time) on June 30, 2009, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 or such later time or other place as the Debtors notify all Qualified Bidders who have submitted Qualified Bids (provided, however, that the Debtors shall not conduct the Auction on a date later than July 6, 2009 without the consent of the Purchasers).

- Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in such minimum increments or other bid improvements as determined by the Debtors in consultation with the DIP Agent and the Creditors' Committee.  At the conclusion of the Auction, the Debtors, in consultation with the DIP Agent and the Creditors' Committee, will identify the highest or otherwise best offer for the Acquired Assets received at the Auction.

**F.      Purchasers' Agreement And Bid Protection**

25.      In order to provide an incentive and to compensate the Purchasers for entering into the Agreement and the extensive fees and costs incurred as serving as the stalking horse purchaser, the Debtors have agreed to a break-up fee in the amount of $1,650,000 and to reimburse the Purchasers for $2 million for expenses incurred in connection with the Purchasers' attempted purchase of the Acquired Assets and service as stalking horse bidder.  The Purchasers have represented to the Debtors that they have obtained debt and equity commitments for a substantial portion of the purchase price of the transaction and that will provide the Debtors will all financing commitment letters related to the financing of the transaction.  Accordingly, the availability of the Bid Protections to the Purchasers is contingent upon delivery of such commitment letters.

26.     By this Motion, the Debtors are seeking approval to provide certain bid

protections to the Purchasers in accordance with the Agreement.  The Debtors believe that

offering a break-up fee and expense reimbursement to the Purchasers having superpriority

payment (the "Bid Protections") will benefit the Debtors' estates by establishing a floor and

promoting more competitive bidding.  Without such a fee, bidding on the Debtors' Acquired

Assets would likely be reduced.  The availability of the Bid Protections is necessary in order to

provide Emerisque with some assurance that it will be compensated for the time and expense it

has spent in putting together its offer for the Acquired Assets and the risk that arises from

participating in the Sale and subsequent bidding process as the stalking horse bidder.

**G.     Notice of Bidding Procedures and Sale**

27.     Notice of Sale Hearing.  Within five days after the entry of the Bidding

Procedures Order (the "Mailing Date") or as soon thereafter as practicable, the Debtors (or their

agents) shall serve the notice substantially in the form attached to the Bidding Procedures Order

as Exhibit 2 (the "Sale Notice") along with the Motion, the Agreement, the proposed Sale

Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-

class mail, postage prepaid, upon (i) all parties to the Assigned Contracts, (ii) all parties that have

requested special notice in these Chapter 11 Cases; (iii) the Office of the United States Trustee

for the Northern District of Illinois (iv) the Pension Benefit Guaranty Corporation; (v) the

Sellers' labor unions; (vi) counsel for the official committee of unsecured creditors appointed in

these Chapter 11 Cases; (vii) counsel for Wachovia; (viii) the Purchasers and counsel for

Purchasers; (ix) all entities known to have expressed an interest in a transaction with respect to

any of the Acquired Assets during the past year from the Effective Date of the Agreement; (x)

those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in

these Chapter 11 Cases; (xi) all Governmental Entities and taxing authorities having or asserting

14

jurisdiction over Sellers or any of the Acquired Assets (including the Internal Revenue Service, the United States Department of Justice, the United States Attorney Office for Northern District of Illinois, and the Securities and Exchange Commission); (xii) the counterparties to the Rejected Contracts; and (xiii) all parties asserting Encumbrances on any of the Acquired Assets (the "Sale Notice Parties").  In addition, by the Mailing Date, the Debtors (or their agent) shall serve the Sale Notice only upon all parties identified as creditors set forth on Schedules D through H of each of the Sellers' Schedules of Statements and Liabilities.

28.    Publication Notice. The Debtors also propose, pursuant to Bankruptcy Rule 2002(l) and 2002(d), that the publication of the Sale Notice, modified for publication, in newspapers and other publications determined by the Debtors to be advisable, on the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

## H.    Notice Procedures

29.    The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases.

30.    Cure Notice.  On or before June 10, 2009, the Debtors will file with the Court and serve on each non-Debtor party to an Assumed Contract a cure notice substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Cure Notice").  The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each party that such party's contract or lease will be assumed and assigned to the Purchasers or a Successful Bidder to be identified at the conclusion of the Auction.  Each non-Debtor party to the Assumed Contracts shall have ten days from the date of the Cure Notice to object to the Cure

15

Amount and must state in its objection with specificity what Cure Amount is required (with appropriate documentation in support thereof). If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, or any other document, and the non-Debtor party to the Assumed Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims as to such Assumed Contract against the Debtors, the Purchasers, or the Successful Bidder, or the property of any of them. If an objection to the Cure Amount is timely filed and received and the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code, if any, with respect to such objection will be determined at a hearing to be requested by the Debtors or by the objecting counterparty. At the Purchasers' or the Successful Bidders' discretion, and provided the Purchasers or the Successful Bidder escrow the disputed portion of the Cure Amount, the hearing regarding the Cure Amount may be continued until after the Closing Date and the Assumed Contract(s) subjected to such Cure Amount shall be assumed and assigned to the Purchasers or the Successful Bidder at Closing.

31.     _Assumption/Assignment Notice For Purchasers_. At least 15 days prior to the Sale Hearing, the Debtors shall file with the Court and serve on all non-Debtor parties to the Assigned Contracts a notice (the "_Purchasers Assumption/ Assignment Notice_"), substantially in the form of the notice attached to the Bidding Procedures Order as _Exhibit 4_, identifying the Purchasers as the party which will be assigned all of the Debtors' right, title, and interest in the Assigned Contracts, subject to completion of the bidding process provided under the Bidding Procedures. The non-Debtor party to an Assumed Contract shall have seven days from the service of the Purchasers Assumption/ Assignment Notice to object to the proposed assumption and assignment to the Purchasers and shall state in its objection, with specificity, the legal and

factual basis of its objection.  If no objection is timely received, the Debtors propose that the

non-Debtor party to the Assumed Contract be deemed to have consented to the assumption and

assignment of the Assumed Contract to the Purchasers and be forever barred from asserting any

objection with regard to the assumption and assignment.

              32.      <u>Assumption/Assignment Notice For Qualified Bidders</u>.  At least 15 days

prior to the Sale Hearing or on the business day following the Bid Deadline, whichever is later,

the Debtors shall cause a notice (the "<u>Qualified Bidder Assumption/Assignment Notice</u>"),

substantially in the form of the notice attached to the Bidding Procedures Order as <u>Exhibit 5</u>, to

be sent to each non-Debtor party to an Assigned Contract identifying all Qualified Bidders

(except the Purchaser, which notice shall be governed by the Purchasers Assumption/Assignment

Notice set forth above).  The Debtors propose that the non-Debtor party to an Assumed Contract

have seven days from the service of the Qualified Bidder Assumption/Assignment Notice or two

days prior to the Sale Hearing, whichever is earlier, to object to the proposed assumption and

assignment to any Qualified Bidder and shall state in its objection, with specificity, the legal and

factual basis of its objection.  The Debtors further submit that, if no objection is timely received,

the non-Debtor party to the Assumed Contract be deemed to have consented to the assumption

and assignment of the Assumed Contract to any Qualified Bidder and be forever barred from

asserting any objection with regard to the assumption and assignment.

              33.      At the Sale Hearing, the Debtors shall (i) present evidence necessary to

demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request

entry of an order requesting approval of the assumption and assignment of any Assigned

Contracts to any Successful Bidder.

              34.      <u>Termination or Rejection of Rejected Contracts</u>.  As contemplated in the

Agreement, the Debtors seek authority from this Court to terminate or reject the Rejected

17

Contracts pursuant to section 365 of the Bankruptcy Code so that no rights of the licensees under such Rejected Contracts will be retained if the Purchasers are the Successful Bidders at the Auction. However, to the extent that the Purchasers are not the Successful Bidders for the Acquired Assets, the Debtors reserve the right to withdraw their request for such relief.

35.     <u>Non-Omnibus Hearing Appropriate</u>. The Debtors request a hearing outside of the omnibus hearing dates established in the case management procedures established in these Chapter 11 Cases to consider the entry of the Bidding Procedures Order as well as entry of the Sale Approval Order. As noted above, the successful Sale of the Acquired Assets and maximization of the value of that Sale to the estate hinges upon the effectuation of such a Sale within a specific timeframe. The Debtors have been engaged in a many months-long process to market and negotiate a Sale of all or a portion of their assets and additional postponement in the approval of the Bidding Procedures Order or the Sale Approval Order to omnibus hearing dates serves to introduce unnecessary uncertainty and delay into the process.

## <u>APPLICABLE AUTHORITY</u>

36.     "[T]he business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" <u>Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb</u>, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del. 1988)); <u>see also</u> <u>Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford</u>, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. <u>See</u> <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169 , 179 (D. Del. 1991).

37.     The Debtors have sound business justifications for selling the Acquired Assets at this time.  While the Debtors currently have limited access to capital, they are endowed with a strong customer base, well-respected brands, and solid operations.  Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of all or a portion of the Acquired Assets.

A.     **The Bidding Procedures are Fair and Are Designed to Maximize the Value Received for the Acquired Assets**

38.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed herein are designed to maximize the value received for the Acquired Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.  The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for portions of the Acquired Assets or the Acquired Assets as a whole as determined by the Debtors, in consultation with the Creditors' Committee and the DIP Lenders.

39.     The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing.  Accordingly, the Debtors and all parties in interest can be assured that the consideration for the Acquired Assets

19

will be fair and reasonable, and there are sound business reasons to approve the Bidding

Procedures.

**B.      The Break-up Fee and Expense Reimbursement Are Necessary To Preserve the Value of the Debtors' Estates**

40.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the

ordinary course of business may be by private sale or by public auction.  The Debtors believe

that having the ability to offer the Bid Protections to the Purchasers and thereby facilitating an

Auction will maximize the realizable value of the Acquired Assets for the benefit of the Debtors'

estates, creditors and other parties-in-interest.

41.     The Third Circuit, for example, identified at least two instances in which

bidding incentives may benefit the estate.  First, a break-up fee or expense reimbursement may

be necessary to preserve the value of the estate if assurance of the fee "promote[s] more

competitive bidding, such as by inducing a bid that otherwise would not have been made and

without which bidding would have been limited."  Calpine Corp. v. O'Brien Envtl. Energy, Inc.

(In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien").

Second, if the availability of break-up fees and expenses were to induce a bidder to research the

value of the debtor and convert that value to a dollar figure on which other bidders can rely, the

bidder may have provided a benefit to the estate by increasing the likelihood that the price at

which the debtor is sold will reflect its true worth. Id.

42.     In O'Brien, the Third Circuit reviewed the nine factors set forth by the

lower court as relevant in deciding whether to award a break-up fee.  Such factors are as follows:

(A)     the presence of self-dealing or manipulation in negotiating
        the breakup fee;

(B)     whether the fee harms, rather than encourages, bidding;

(C)     the reasonableness of the break-up fee relative to the purchase price;

(D)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(E)     the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders";

(F)     the correlation of the fee to a maximization of value of the debtor's estate;

(G)     the support of the principal secured creditors and creditors committees of a break-up fee;

(H)     the benefits of the safeguards to the debtor's estate; and

(I)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

43.     Purchasers Bid Protections.  The Bid Protections set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Acquired Assets and, thus, insist that competing bids be materially higher or otherwise better than the Agreement, a clear benefit to the Debtors' estates.  Moreover, the Purchasers would not agree to act as a stalking horse bidder without the Bid Protections.  Without the benefit of the Purchasers, the bids received at Auction for the Acquired Assets could be substantially lower than that offered by the Purchasers.

44.     Moreover, payment of the Bid Protections will not diminish the Debtors' estate.  The Debtors do not intend to terminate the Agreement, if to do so would incur an obligation to pay the Bid Protections, unless to accept an alternative bid.

**C.    Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

45.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. §363(b)(1).  A debtor's sale or use of assets outside the ordinary course of business should be approved by the Bankruptcy Court if the debtor can demonstrate a sound business justification for the proposed transaction.  See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbott's Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

46.    The Debtors have a sound business justification for selling the Acquired Assets at this time and in the manner proposed.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all or some of their Acquired Assets in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries to the estates.  Maximization of the Acquired Assets' value is a sound business purpose warranting authorization of any proposed Sale.

47.    The Sale of any of the Debtors' Acquired Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for

22

the Acquired Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[10]

48.     In addition, all creditors and parties in interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Acquired Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale(s) as soon as possible is in the best interests of the Debtors and its creditors and parties in interest.

**D.     The Proposed Sale(s) Satisfy the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

49.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). The Debtors believe that they will be able to demonstrate that at the Sale Hearing that they have satisfied one or more of these conditions.

50.     The Debtors believe that at least certain of the secured lenders will consent to the sale free and clear under section 363(f)(2). Where that may not be the case, a sale free and

---

[10]     The Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the secured

lenders' liens will attach to the proceeds of the sale and the Debtors will establish at the Sale

Hearing that the secured lenders can be compelled to accept a monetary satisfaction of their

claims.

51.    The Debtors propose that any bona fide and allowed Interests shall attach

to the sale proceeds with the same force, validity, effect, priority and enforceability as such

Interests had in the Acquired Assets prior to such Sale.

**E.     A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

52.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith

purchaser is one who purchases assets for value, in good faith, and without notice of adverse

claims.  In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re

Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-

51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); Abbotts Dairies of Penn., 788

F.2d at 147.

53.    The Agreement was negotiated at arm's-length, with both parties

represented by their own counsel through extensive negotiations.  Although the Debtors engaged

in discussions with other parties interested in acquiring certain of their Acquired Assets, the

Debtors submit that Emerisque's proposal as contained in the Agreement represents Emerisque's

highest and best offer for the Acquired Assets.  Additionally, the Debtors will adduce facts at the

Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder

for all or any portion of the Acquired Assets has negotiated at arm's-length, with all parties

represented by their own counsel.

54.    Accordingly, the Sale Approval Order will include a provision that the

Successful Bidder for the Acquired Assets, is a "good faith" purchaser within the meaning of

section 363(m) of the Bankruptcy Code.  The Debtors believe that providing any Successful

Bidder with such protection will ensure that the maximum price will be received by the Debtors

for the Acquired Assets and closing of the same will occur promptly.

**F.    The Assumption and Assignment of Executory Contracts and Unexpired Leases**

55.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or

unexpired lease is whether the debtor's reasonable business judgment supports assumption or

rejection.  See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If

the debtor's business judgment has been reasonably exercised, a court should approve the

assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional

Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l

Fuel Gas Distrib. Corp., 872 F. 2d 36, 39-40 (3d Cir. 1989).  The business judgment test

"requires only that the trustee [or debtor in possession] demonstrate that [assumption or]

rejection of the contract will benefit the estate."  Wheeling-Pittsburgh Steel Corp. v. West Penn

Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)

(quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more

exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere

with the Bankruptcy Code's provision for private control of administration of the estate, and

threaten the court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital

Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the

Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide

adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

56.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

57.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

58.     Emerisque is a specialist private investment firm based in London, United Kingdom.  Emerisque focuses its investments in under-performing European and US consumer goods brands with a substantial brand franchise which can be rapidly scaled in emerging markets

and has significant turnaround expertise in this sector as evidenced by members of its group's

involvement in the revivals of the Puma, Ben Sherman, and Lee Cooper brands.  Upon closing,

Emerisque will have financial resources that are sufficient to perform under any executory

contracts or unexpired leases it seeks to have assumed by the Debtors (the "Assumed

Contracts").  Moreover, if necessary, the Debtors will adduce facts at the hearing on any

objection demonstrating the financial wherewithal of Emerisque or any Successful Bidder, and

their willingness and ability to perform under the contracts to be assumed and assigned to them.

The Sale Hearing therefore will provide the Court and other interested parties ample opportunity

to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate

assurance of future performance under the Assumed Contracts.

        59.    The Debtors respectfully submit that the proposed Notice Procedures are

appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in

the form of the Notice of Assumption or Cure Notice, as applicable, of the proposed assumption

and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

Such Contract Notice Parties will then be given an opportunity to object to such notice.  If an

objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as

determined by the Debtors.

        60.    Furthermore, to the extent that any defaults exist under any executory

contract or unexpired lease that is to be assumed and assigned in connection with the Sale of any

of the Acquired Assets, the Debtors will cure any such default prior to such assumption and

assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the

financial wherewithal of the Successful Bidder(s), its experience in the industry, and its

willingness and ability to perform under the contracts to be assumed and assigned to it.

61.     Accordingly, the Debtors submit that implementation of the proposed

Notice Procedures is appropriate in these cases.  The Court therefore should have a sufficient

basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in a

Successful Bidder's asset purchase agreement.

## G.     Termination or Rejection of the Rejected Contracts

62.     Pursuant to the Agreement, the Debtors are required to seek to reject or

otherwise terminate the Rejected Contracts.   The Debtors expect to consensually terminate the

Rejected Contracts and seek, out of an abundance of caution, this Court's approval of such

consensual termination.  However, despite this belief and as a precaution, the Debtors also seek

approval from this Court, should it be necessary, to either terminate non-consensually or reject

the Rejected Contracts.   As noted above, Section 365(a) of the Bankruptcy Code allows the

Debtors to reject any executory contract or unexpired lease if such rejection represents a

reasonable exercise of their business judgment.  See In re Orion Pictures Corp., 4 F.3d 1095,

1099 (2d Cir. 1993); See In re Bullet Jet Charter, Inc., 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995);

In re Del Grosso, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990); Johnson v. Fairco Corp., 61 B.R.

317, 319-20 (N.D. Ill. 1986).   Additionally, Section 363(b) of the Bankruptcy Code provides, in

relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other

than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  If a

debtor's proposed use of property pursuant to section 363(b) of the Bankruptcy Code represents a

reasonable business judgment on the part of the debtor, such use should be approved.  See, e.g.,

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir.

1983); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).   The business

judgment test requires only that Debtors demonstrate that the rejection will benefit the estate.

See e.g. In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).  The Debtors clearly

28

satisfy the business judgment standard in this case.  In order to effectuate the Agreement with the

Purchasers, the Debtors have agreed, in the sound exercise of their business judgment, to reject

or terminate the Rejected Contracts.  Such rejection or termination will benefit the Debtors'

estates by forwarding the Sale of the Acquired Assets in such a manner as maximize the potential

recoveries for the Debtors' creditors.

**H.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

    63.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property…is stayed until the expiration of 10 days after entry of the order, unless the

court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease…is stayed until the

expiration of 10 days after the entry of the order, unless the court orders otherwise."  The

Debtors request that any Sale Approval Order be effective immediately by providing that the 10-

day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

<u>**NOTICE**</u>

    64.  Notice of this Motion will be given to: (a) the Office of the United States

Trustee for the Northern District of Illinois; (b) the Securities and Exchange Commission; (c) the

Internal Revenue Service; (d) the United States Attorney Office for Northern District of Illinois;

(e) counsel to the DIP Agent; (g) counsel to the Creditors' Committee; (h) all entities known to

have expressed an interest in a transaction with respect to any of the Acquired Assets during the

past year from the Effective Date of the Agreement; (i) counsel to the Purchasers; and (j) those

persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these

Chapter 11 Cases.  Further, after entry of the Bidding Procedures Order, notice with respect to

the Motion and Sale will be provided in accordance with the Notice Procedures described herein

The Debtors submit that, under the circumstances, no other or further notice is required.

29

## NO PRIOR REQUEST

65.    No previous request for the relief sought herein has been made to this or any other court.

## WAIVER OF PAGE LIMIT RESTRICTIONS

66.    Given the complexity of issues addressed herein, the Debtors respectfully request retroactive leave for this Motion to exceed the fifteen (15) page limit established by Rule 5005-3(C) of the Local Rules for the United States Bankruptcy Court Northern District of Illinois.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding

Procedures Order substantially in the form attached hereto (i) approving the Bidding Procedures;

(ii) approving the Bid Protections; (iii) scheduling a Auction and a Sale Hearing to approve such

sale or sales, and approving the form and manner of notice thereof; and (iv) granting such other

and further relief as may be just and proper.  Additionally, the Debtors request that at the Sale

Hearing the Court enter one or more Sale Approval Orders subject to the result of the Auction

and to the Bidding Procedures (i) approving and authorizing the Sale; (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases; (iii) authorizing

the termination or rejection of the Rejected Contracts such that no rights are retained thereunder

after such termination or rejection; and (iv) granting such other and further relief as may be just

and proper.

Dated: Chicago, Illinois
       May 21, 2009

                                            /s/ George N. Panagakis
                                            George N. Panagakis (ARDC #620527 1)
                                            Felicia Gerber Perlman (ARDC #062 10753)
                                            Eric J. Howe (ARDC #6291643)
                                            SKADDEN, ARPS, SLATE, MEAGHER
                                              & FLOM LLP
                                            333 West Wacker Drive, Suite 2100
                                            Chicago, Illinois 60606-1285
                                            Telephone: (312) 407-0700

                                            Attorneys for Debtors and Debtors-in-Possession