IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 09-02046 (BWB) |
|  | ) | (Jointly Administered) |
|  | ) | Chapter 11 |
| HARTMARX CORPORATION, | ) |  |
| et al., | ) | Hon. Bruce W. Black |
|  | ) |  |
| Debtors.[1] | ) |  |
|  | ) |  |

**ORDER (A) APPROVING THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; (C) ASSUMPTION OF CERTAIN LIABILITIES; (D)
AUTHORIZING THE TERMINATION AND REJECTION OF CERTAIN EXECUTORY
CONTRACTS; AND (E) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "Motion") of Hartmarx Corporation ("Hartmarx" or the

"Company") and 50 of its subsidiaries, debtors and debtors-in-possession (collectively, the

---

[1] The Debtors consist of: Hartmarx Corporation (FEIN: 36-3217140); Anniston Sportswear Corporation (FEIN: 63-0255951); Briar, Inc. (FEIN: 36-3295194); Chicago Trouser Company, Ltd. (FEIN: 36-3654087); C.M. Clothing, Inc. (FEIN: 62-0726470); C.M. Outlet Corp. (FEIN: 23-2079484); Consolidated Apparel Group, Inc. (FEIN: 36-4451205); Country Miss, Inc. (FEIN: 23-2159300); Country Suburbans, Inc. (FEIN: 13-2536025); Direct Route Marketing Corporation (FEIN: 36-3353564); E-Town Sportswear Corporation (FEIN: 35-1045839); Fairwood-Wells, Inc. (FEIN: 36-2793207); Gleneagles, Inc. (FEIN: 52-0382880); Handmacher Fashions Factory Outlet, Inc. (FEIN: 62-0699057); Handmacher-Vogel, Inc. (FEIN: 13-2522868); Hart Services, Inc. (FEIN: 36-3119791); Hart Schaffner & Marx (FEIN: 36-1196390); Hartmarx International, Inc. (FEIN: 36-3849547); Hickey-Freeman Co., Inc. (FEIN: 05-0522438); Higgins, Frank & Hill, Inc. (FEIN: 36-3119788); HMX Luxury, Inc. (FEIN: 36-3432123); HMX Sportswear, Inc. (FEIN: 13-2882518); Hoosier Factories, Incorporated (FEIN: 35-1103970); HSM Real Estate LLC (FEIN: 36-4421906); HSM University, Inc. (FEIN: 36-3635288); Intercontinental Apparel, Inc. (FEIN: 22-2268615); International Women's Apparel, Inc. (FEIN: 74-1312494); Jaymar-Ruby, Inc. (FEIN: 35-0392340); JRSS, Inc. (FEIN: 35-1695663); Kuppenheimer Men's Clothiers Dadeville, Inc. (FEIN: 63-0179270); Monarchy Group, Inc. (FEIN: 26-0472040); National Clothing Company, Inc. (FEIN: 13-3056089); NYC Sweaters, Inc. (FEIN: 20-5399484); 106 Real Estate Corp. (FEIN: 23-1609394); Robert's International Corporation (FEIN: 36-3671895); Robert Surrey, Inc. (FEIN: 36-6163392); Salhold, Inc. (FEIN: 36-3806997); Seaford Clothing Co. (FEIN: 36-1692913); Simply Blue Apparel, Inc. (FEIN: 20-3583172); Society Brand, Ltd. (FEIN: 36-6114108); Sweater.com Apparel, Inc. (FEIN: 20-5300452); Tag Licensing, Inc. (FEIN: 36-2876915); Tailored Trend, Inc. (FEIN: 13-1540282); Thorngate Uniforms, Inc. (FEIN: 23-1007260); Thos. Heath Clothes, Inc. (FEIN: 36-6114533); Trade Finance International Limited (FEIN: 36-3758253); Universal Design Group, Ltd. (FEIN: 36-3758257); M. Wile & Company, Inc. (FEIN: 16-0959019); Winchester Clothing Company (FEIN: 61-0983980); Yorke Shirt Corporation (FEIN: 36-3440608); Zooey Apparel, Inc. (FEIN: 20-5917889).

"Debtors") for entry of orders pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P.

2002, 6004, and 6006 (a) (i) approving certain bidding procedures, (ii) granting certain bid

protections, (iii) approving the form and manner of sale notices, and (iv) setting a sale hearing

date (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of

substantially all of the Debtors' assets (the "Acquired Assets"), free and clear of liens, claims,

encumbrances, and interests to Emerisque Brands UK Limited and SKNL North America, B.V.

(collectively, the "Purchasers") pursuant to the Asset Purchase Agreement, dated May 21, 2009

(as amended from time to time, the "Agreement")[2], by and between Hartmarx and certain of its

subsidiaries named in the Agreement (collectively, the "Sellers") and the Purchasers, or to the

Successful Bidder submitting a higher or otherwise better bid, (ii) the assumption and/or

assignment of the Assigned Contracts to the Purchasers or the Successful Bidder, as applicable,

(iii) the assumption of the Assumed Liabilities by the Purchasers or the Successful Bidder, as

applicable, and (iv) the rejection and termination of the Rejected Contracts; and the Court having

reviewed the Motion and having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors and other parties in interest; and it appearing

that notice of the Motion was good and sufficient under the particular circumstances and that no

other or further notice need be given; and after due deliberation thereon; and good and sufficient

cause appearing therefor, it is hereby,

## FOUND AND DETERMINED THAT:[3]

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement and/or the Motion, as applicable.

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

1326049.1

A.   **Jurisdiction and Venue.**  The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(B)(2)(a).  Venue of these Chapter 11 Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.   **Statutory Predicates.**  The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014.

C.   **Petition Date.**  On January 23, 2009 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended.

D.   **Entry of Bidding Procedures Order.**  On June 2, 2009, this Court entered an order (the "Biding Procedures Order") (i) approving certain bidding procedures (the "Bidding Procedures"), (ii) granting certain bid protections as provided in the Agreement, (iii) approving the manner of notice of the Motion, the Auction, the Bidding Procedures, the Sale Hearing, and the assumption and/or assignment of the Assigned Contracts, (iv) approving the form of notice of the Motion, the Auction, the Bidding Procedures and the Sale Hearing to be distributed to parties-in-interest, including prospective bidders, (v) approving the form of notice of the Cure Amounts (as defined in the Bidding Procedures Order) and the assumption of the Assumed Contracts to be filed with the Court and served on parties to each Assumed Contract, and (vi) setting the Sale Hearing.

E.   **Compliance with Bidding Procedures Order.**  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the

3

Acquired Assets and conducted the sale process in compliance with the Bid Procedures Order and the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner. The Debtors and their professionals have actively marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures and Bidding Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.

F.    **Notice**. As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of (a) the Motion, (b) the Auction, (c) the Bidding Procedures, (d) the Sale Hearing, (e) the Sale, (f) the assumption and/or assignment of the Assigned Contracts, (g) the Cure Amounts, and (h) the rejection and termination of the Rejected Contracts (collectively, the "Requested Relief"), has been provided in accordance with sections 102(l), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and in compliance with the Bidding Procedures Order (including notice by publication in the Wall Street Journal (U.S. Edition) on June 5, 2009, the Chicago Tribune on June 7, 2009, and the Wall Street Journal (International Edition) on June 8, 2009), (ii) such notice was good and sufficient, and appropriate under the particular circumstances, including, without limitation, with respect to parties or entities that may have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors, and (iii) no other or further notice of the Requested Relief is or shall be required. The disclosures made by the Debtors concerning the Requested Relief were good, complete and adequate.

G.    **Corporate Authority**. Each Debtor (i) has full corporate power and authority to execute the Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary

4

corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Agreement, (iii) has taken all corporate action necessary to authorize and approve the Agreement and the consummation by such Debtors of the transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtors to consummate such transactions.

        H.      **Opportunity to Object**. A fair and reasonable opportunity to object or be heard with respect to the Requested Relief has been afforded to all interested persons and entities, including, without limitation: (i) all parties to the Assigned Contracts, (ii) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these Chapter 11 Cases; (iii) the Office of the United States Trustee for the Northern District of Illinois (iv) the Pension Benefit Guaranty Corporation; (v) the Sellers' labor unions; (vi) counsel for the official committee of unsecured creditors appointed in these Chapter 11 Cases; (vii) counsel for Wachovia; (viii) the Purchasers and counsel for Purchasers; (ix) all entities known to have expressed an interest in a transaction with respect to any of the Acquired Assets during the past year from the Effective Date of the Agreement; (x) all Governmental Entities and taxing authorities having or asserting jurisdiction over Sellers or any of the Acquired Assets (including the Internal Revenue Service, the United States Department of Justice, the United States Attorney Office for Northern District of Illinois, and the Securities and Exchange Commission); (x) the holders of the Debtors' 50 largest unsecured claims; (xi) all parties asserting Encumbrances on any of the Acquired Assets; (xii) non-debtor counter-parties to the Rejected Contracts; and (xiii) all creditors of the Sellers as identified on Schedules D through H of each of the Sellers' Schedules of Assets and Liabilities filed with the Court.

1326049.1

I. **Sale in Best Interest.** Consummation of the Sale of the Acquired Assets at this time is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

J. **Business Justification.** Sound business reasons exist for the Sale and the other Requested Relief. Entry into the Agreement and rejection and termination of the Rejected Contracts constitute the Debtors' exercise of sound business judgment and such acts are in the best interests of the Debtors, their estates, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale and the Requested Relief. Such business reasons include, but are not limited to, the following: (i) the Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going concern basis and avoid decline and devaluation of the Acquired Assets; and (iii) any plan would have likely yielded, at best, the same economic result.

K. **Arms-Length Sale.** The Agreement was negotiated, proposed and entered into by the Debtors and the Purchasers without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Purchasers have engaged in any conduct that would cause or permit the Agreement to be avoided under 11 U.S.C. § 363(n).

L. **Good Faith Purchasers.** The Purchasers are good faith Purchasers under 11 U.S.C. § 363(m) and, as such, are entitled to all of the protections afforded thereby. The Purchasers will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Agreement at all times after the entry of this Order.

M. **Consideration.** The Debtors conducted an Auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order. The

Auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Acquired Assets. The Auction was duly noticed and conducted in a noncollusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets. The consideration provided by the Purchasers for the Acquired Assets pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

1326049.1

N.    **Free and Clear.**  The Purchasers would not have entered into the

Agreement and would not consummate the transactions contemplated thereby if the Sale of the

Acquired Assets to the Purchasers, the assumption, assignment and sale of the Assigned

Contracts to the Purchasers, and the assumption of the Assumed Liabilities by the Purchasers

were not free and clear of all Encumbrances of any kind or nature whatsoever, or if the

Purchasers would, or in the future could be liable for any of such Encumbrances.  The Debtors

may sell the Acquired Assets free and clear of all Encumbrances because, with respect to each

creditor asserting an Encumbrance, one or more of the standards set forth in Bankruptcy Code §

363(f)(1)-(5) has been satisfied.  Those holders of liens, claims or encumbrances who did not

object or withdrew objections to the Sale are deemed to have consented to the Sale pursuant to

section 363(f)(2) of the Bankruptcy Code.  Those holders of liens, claims or encumbrances who

did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy

Code.

O.    **Assumption of Executory Contracts and Unexpired Leases.**  The (i)

transfer of the Acquired Assets to the Purchasers and (ii) assignment to the Purchasers of the

Assigned Contracts, will not subject the Purchasers to any liability whatsoever with respect to

the Acquired Assets prior to the Closing Date (defined below) or by reason of such transfer

under the laws of the United States, any state, territory, or possession thereof, or the District of

Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity,

including, without limitation, any theory of equitable law, including, without limitation, any

theory of antitrust or successor or transferee liability.  The Debtors have demonstrated that it is

an exercise of their sound business judgment to assume and/or assign the Assigned Contracts to

the Purchasers in connection with the consummation of the Sale, and the assumption and/or

8

Document   Page 9 of 50

assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, and their creditors. The Assigned Contracts being assigned to the Purchasers are an integral part of the Acquired Assets being purchased by the Purchasers and, accordingly, such assumption and/or assignment of the Assigned Contracts is reasonable, enhance the value of the Debtors' estates, and does not constitute unfair discrimination.

            P.     **Cure Amounts/Adequate Assurance.** The Cure Amounts for each of the Assigned Contracts set forth in Exhibit A hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assigned Contracts. The Debtors have (i) cured, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). The Purchasers have provided adequate assurance of their future performance of and under the Assumed Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C). At the Purchasers' discretion, provided the Purchasers escrow the disputed portion of any Cure Amount, any Assumed Contract for which there is a pending Cure Amount dispute as of the Closing Date may still be assumed and assigned to Purchaser at Closing.

9

Q.    **Prompt Consummation.** The Sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is of the essence in consummating the Sale, and the Debtors and the Purchasers intend to close the Sale as soon as possible. Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

R.    **No Fraudulent Transfer.** The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia. The consideration under the Agreement provided by the Purchasers is the highest and otherwise best offer received by the Debtors, and such consideration constitutes reasonably equivalent value for the Acquired Assets under the Bankruptcy Code and other applicable law.

S.    **Purchasers Not Insiders.** Immediately prior to the Closing Date, the Purchasers were not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchasers and the Debtors. Pursuant to the Agreement, the Purchasers are not purchasing all of the Debtors' assets in that the Purchasers are not purchasing any of the Excluded Assets, and the Purchasers are not holding themselves out to the public as a continuation of the Debtors. The Sale does not amount to a consolidation, merger or de facto merger of the Purchasers and the Debtors and/or the Debtors' estate, there is not substantial continuity between the Purchasers and the Debtors, there is no continuity of enterprise between

10

the Debtors and the Purchasers, the Purchasers are not a mere continuation of the Debtors or the Debtors' estate, and the Purchasers do not constitute successors to the Debtor or the Debtors' estates to the extent allowed under state law.

T.  **Legal, Valid Transfer.**  The transfer of the Acquired Assets to Purchasers will be a legal, valid, and effective transfer of the Acquired Assets, and will vest Purchasers with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims and encumbrances, except as set forth in the Agreement.

U.  **Not a Sub Rosa Plan.**  The Sale does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

It is therefore **ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.  The Motion is GRANTED, as further described herein.

2.  All objections and responses to the Motion or the relief requested therein are resolved in accordance with the terms of this Order, and to the extent any such objection or response has not otherwise been withdrawn, waived, or settled as provided herein (and all reservations of rights included therein), are overruled on the merits and denied with prejudice.

**Approval of the Sale of the Acquired Assets**

3.  The Agreement, and all of the terms and conditions therein, are hereby approved.

1326049.1

4.      Pursuant to 11 U.S.C. § 363(b), the Sale of the Acquired Assets to the Purchasers free and clear of all Encumbrances, and the transactions contemplated thereby are approved in all respects.

5.      Except as otherwise specifically provided in the Agreement, the Purchasers shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchasers shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets prior to the Closing Date.

6.      The transactions contemplated by the Agreement are undertaken by the Purchasers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchasers (including, without limitation, the assumption, assignment and/or sale of any of the Assigned Contracts), unless such authorization is duly stayed pending such appeal. Each of the Purchasers is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

7.      Pursuant to 11 U.S. C. § 363(b), the Debtors are hereby authorized to sell the Acquired Assets to Purchasers and consummate the Sale in accordance with and subject to the terms and conditions of the Agreement, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance

12

with and subject to the terms and conditions of the Agreement. The Debtors, as well as their affiliates, officers, employees and agents, are further authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, including without limitation the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by Purchasers for the purposes of assigning, transferring, granting, conveying and conferring to Purchasers or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Agreement. The Parties shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to their obligations to do so as set forth in Article VI thereof have been satisfied or waived.

**Transfer of Acquired Assets**

8.      Pursuant to 11 U.S.C. § 363(b) and 363(f), the Acquired Assets shall be transferred to the Purchasers upon consummation of the Agreement (the "Closing Date") free and clear of all Encumbrances of any kind or nature whatsoever with all such Encumbrances of any kind or nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto; provided that on the Closing Date all proceeds of the Adjusted Base Purchase Price and the Junior Secured Note shall be remitted or delivered to Wachovia as agent for the DIP Lenders for application against the Obligations (as defined in the DIP Order); provided further, however, that a sum from the Sale proceeds paid to Wachovia and DIP Lenders in an amount representing the proceeds paid to the DIP Lenders from the termination of the lease at 666 Fifth Avenue, New York, New

York will be held by Wachovia in a segregated account pending the disposition of the adversary proceeding at No. 09-A458 (nothing in this Order shall impair any of Wachovia's and DIP Lenders' rights claims and defenses in such adversary, all of which are reserved).

9. All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchasers on the Closing Date.

10. Except as expressly permitted or otherwise specifically provided by the Agreement, the Junior Secured Note and all documents executed and/or delivered in connection with the Junior Secured Note, or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Encumbrances of any kind or nature whatsoever against or in the Debtors or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, or the transfer of the Acquired Assets to the Purchasers, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchasers, their successors or assigns, their property, or the Acquired Assets, such persons' or entities' Encumbrances on and after the Closing Date of the Sale.

11. On the Closing Date of the Sale, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances in the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

14

12.     Subject to the terms and conditions of this Order, the transfer of the Acquired Assets to the Purchasers pursuant to the Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Purchasers with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Encumbrances of any kind or nature whatsoever.

13.     In accordance with the Agreement, the Purchasers are hereby authorized in connection with the consummation of the Sale to allocate the Acquired Assets and the Assigned Contracts among their Affiliates, and to assign, sublease, sublicense, transfer or otherwise dispose of any of the Acquired Assets or the rights under any of the Assigned Contracts to their Affiliates, with such Affiliates having all of the rights and protections accorded under this Order and the Agreement.

14.     Upon entry of and subject to this Order, the objection filed by the Committee to the "non-material" amendment to the Debtors' DIP Financing arrangements with Wachovia and the Lenders shall be withdrawn with prejudice.

**Assumption and/or Assignment of Assigned Contracts**

15.     Pursuant to 11 U.S.C. § 105(a) and 365, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Purchasers, and the Purchasers' assumption on the terms set forth in the Agreement, of the Assumed Contracts is hereby approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are hereby deemed satisfied.

16.     The Debtors are hereby authorized in accordance with 11 U.S.C. § 105(a), 363 and 365 to (a) assume and/or assign to the Purchasers, effective upon the Closing Date of the Sale, the Assigned Contracts free and clear of all Encumbrances of any kind or nature

15

whatsoever and (b) execute and deliver to the Purchasers such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchasers.

17.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchasers in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by the Purchasers. Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchasers shall be fully and irrevocably vested in all right, title and interest of the Sellers in, to or under each Assigned Contract that the Purchasers elect to have assumed and/or assigned to them.

18.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Debtors at the Closing Date or as soon thereafter as reasonably practicable in accordance with the terms of the Agreement by the payment or other satisfaction of the Cure Amounts set forth on Exhibit A to this Order, and the Purchasers shall have no liability or obligation arising or accruing prior to the Closing Date, except as otherwise expressly provided in the Agreement. The Cure Amounts for each of the Assigned Contracts is hereby fixed at the amounts set forth on Exhibit A hereto, and the counterparties to the Assigned Contracts are hereby forever bound by such Cure Amounts. After the payment of the relevant Cure Amounts, neither the Debtors nor the Purchasers shall have any further liabilities to any

16

parties to the Assigned Contracts other than the Purchasers' obligations under the Assigned Contracts that become due and payable on or after the Closing Date.

19.    Except for the Cure Amounts, each non-Debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Purchasers, or the property of either of them, any default existing as of the Closing Date.

20.    There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to the Purchasers as a result of the assumption and assignment of the Assigned Contracts. Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. Any party that may have had the right to consent to the assignment of its Assigned Contract is determined to have consented for the purposes of Section 365(e)(2)(A)(ii) of the Bankruptcy Code.

21.    At the Purchasers' discretion, provided the Purchasers escrow the disputed portion of any Cure Amount, any Assumed Contract for which there is a pending Cure Amount dispute as of the Closing Date may still be assumed and assigned to Purchaser at Closing.

22.    The Purchasers have provided adequate assurance of their future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

23.    Nothing herein shall be deemed to adjudicate or otherwise affect any of the following objecting parties' rights with respect to any and all arguments set forth in their

17

respective objections: (i) Western Glove Works and JAG Licensing LLC [Docket Nos. 541 & 542]; (ii) Lyle & Scott Ltd. [Docket Nos. 603, 609 & 628]; (iii) Infor Global Solutions [Docket Nos. 594, 607 & 625]; (iv) New Generation Computing, Inc. [Docket Nos. 559 & 562]; (v) Manhattan Associates, Inc. [Docket No. 605]; (vi) Unicom Systems, Inc. [Docket No. 513]; (vii) SoftLanding Systems, Inc. [Docket No. 515]; (viii) Macro 4, Inc. [Docket No. 514]; (ix) SAP America [Docket No. 599], (x) Gerber Technologies; (xi) TekLink International, Inc. [Docket No. 557]; (xii) Lake Oak Properties, L.P. [Docket No. 579]; (xiii) Hibernian Direct, LLC [Docket No. 590 and 632]; and (ivx) Melvin T. Matsui [Docket No. 575]. All issues, rights, remedies and defenses of all interested parties with respect to the foregoing objections are hereby reserved pending further order of the Court. The hearing on the foregoing objections shall be continued to July 2, 2009 at 2:00 p.m.

## Rejection and Termination of the Rejected Contracts

24.    Pursuant to 11 U.S.C. §§ 365(a) and 365(n)(1)(A), the Rejected Contracts are hereby deemed rejected and terminated as of the date hereof.

25.    The non-debtor counterparties to the Rejected Contracts must file a proof of claim relating to rejection damages so as to be received by the later of (a) thirty (30) calendar days after the date of this Order and (b) July 27, 2009. All rights and defenses of the Debtors are preserved, including all rights and defenses of the Debtors with respect to a claim for damages arising as a result of the rejection of a contract or lease or any claims of the Debtors arising prior to rejection.

## Additional Provisions

26.    The consideration provided by the Purchasers for the Acquired Assets under the Agreement shall be deemed to constitute reasonably equivalent value and fair

18

consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

27.     The consideration provided by the Purchasers for the Acquired Assets under the Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

28.     This Order (a) shall be effective as a determination that, on the Closing Date, all Encumbrances of any kind or nature whatsoever existing as to the Debtors or the Acquired Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

29.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.  A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel the Liens and other encumbrances of record except the Permitted Liens.

30.     If any Person which has filed statements or other documents or agreements evidencing Encumbrances on, or interests in, the Acquired Assets shall not have

1326049.1

delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances and interests of any kind which the Person has or may assert with respect to the Acquired Assets, the Debtors are hereby authorized and directed, and the Purchasers are hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such Person with respect to the Acquired Assets.

31.    The Purchasers shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets other than for the Assumed Liabilities or as otherwise expressly provided for in the Agreement and this Order. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Agreement, the Purchasers shall not be liable for any Claims (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates, and the Purchasers shall have no successor liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing Date.

32.    Effective upon the Closing Date, and except as otherwise expressly provided for in the Agreement, including the Junior Secured Note and all documents executed

20

and/or delivered in connection therewith, persons and entities are forever prohibited and enjoined

from commencing or continuing in any manner any action or other proceeding, whether in law or

equity, in any judicial, administrative, arbitral or other proceeding against the Purchasers, their

successors and assigns, or the Acquired Assets, with respect to any successor liability, including,

without limitation, the following actions: (i) commencing or continuing in any manner any action

or other proceeding against the Purchasers, their successors and assigns, assets or properties; (ii)

enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or

order against the Purchasers, their successors and assigns, assets or properties; (iii) creating,

perfecting or enforcing any Encumbrance against the Purchasers, their successors and assigns,

assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind

against any obligation due the Purchasers or their successors and assigns; (v) commencing or

continuing any action, in any manner or place, that does not comply or is inconsistent with the

provisions of this Order or other orders of the Court, or the agreements or actions contemplated

or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to issue or renew

any license, permit or authorization to operate any of the Acquired Assets or conduct any of the

businesses operated with the Acquired Assets.

33.    Under no circumstances shall the Purchasers be deemed a successor of or

to the Debtors for any Encumbrance against or in the Debtors or the Acquired Assets of any kind

or nature whatsoever. The sale, transfer, assignment and delivery of the Acquired Assets shall

not be subject to any Encumbrance against or in the Debtors, and such Encumbrances of any

kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors.

Except as expressly provided in the Junior Secured Note and the agreements and documents

executed and/or delivered in connection therewith, all persons holding Encumbrances against or

21

in the Debtors or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever against the Purchasers, their property, their successors and assigns, or the Acquired Assets with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets. Following the Closing Date, no holder of an Encumbrance in or against the Debtors shall interfere with the Purchasers' title to or use and enjoyment of the Acquired Assets based on or related to such Encumbrance, or any actions that the Debtors may take in their Chapter 11 Cases.

34.     The Purchasers have given substantial consideration under the Agreement for the benefit of the holders of Encumbrances. In light of such substantial consideration given by the Purchasers, the Purchasers shall be released from all potential or actual claims and Encumbrances related to successor liability.

35.     This Court shall retain jurisdiction to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchasers, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchasers against (i) any of the Excluded Liabilities or (ii) any Encumbrances against or in the Debtors or the Acquired Assets, of any kind or nature whatsoever, whether attaching to the proceeds of the Sale subject to the terms of this Order or otherwise.

22

36.    The terms and provisions of the Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Purchasers, and their respective affiliates, successors and assigns, and any affected this parties including, but not limited to, all persons asserting Encumbrances in the Acquired Assets to be sold to the Purchasers pursuant to the Agreement, notwithstanding any subsequent appointment of any trustee(s), examiner(s) or other fiduciaries appointed under any chapter of the Bankruptcy Code, as to which trustee(s), examiner(s) or other fiduciaries such terms and provisions likewise shall be binding.  The Agreement shall not be subject to rejection or avoidance under any circumstances.

37.    Any amounts that become payable by the Debtors to the Purchasers pursuant to the Agreement (other than the Break-Up Fee and Expense Reimbursement, the treatment and priority of which is set forth in the Bidding Procedures Order) shall (a) constitute an allowed administrative expense claim pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code in each of the Debtors' Chapter 11 Cases, and (b) be paid by the Debtors in the time and manner as provided in the Agreement without further order of this Court. Notwithstanding anything to the contrary contained herein, the Bidding Procedures Order remains in full force and effect and shall be binding on the Debtors and the Purchasers in all respects.

38.    Following the Closing, the Debtors are hereby authorized and directed to change their corporate names and captions of these Chapter 11 Cases, consistent with applicable law and the terms of the Agreement.  The Debtors shall file a notice of change of case caption with the Court within 30 business days after the Closing, and the change of case caption for these Chapter 11 Cases shall be deemed effective as of the Closing.

23

39.     The failure specifically to include any particular provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

40.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

41.     Notwithstanding anything herein to the contrary, nothing in this Order shall be deemed (i) an assumption and assignment of the Loan Agreement and other related documents, dated on or about May 3, 2001, between Bank of America, N.A. and HSM Real Estate, LLC (as such documents may have been amended and assigned from time to time, collectively, the "Des Plaines Loan Documents"), and no such assignment of the Des Plaines Loan Documents shall be approved absent the mutual consent of the Purchasers and Bank of America, N.A., as successor trustee to LaSalle Bank National Association, as trustee for the registered holders of Banc of America Commercial Mortgage, Inc., Commercial Mortgage Pass-Through Certificates, Series 2001-PB1 (the "Lender"), and (ii) to authorize the sale of the real property located at 1680-1700 East Touhy Avenue, Des Plaines, Illinois 60018 (the "Des Plaines Property") absent the mutual consent of the Purchasers and Lender. Provided that mutual consent is obtained, the assignment of the Des Plaines Loan Documents and/or the sale of the Des Plaines Property, as applicable, shall not require any further order of the Court. Nothing herein shall be deemed a waiver of any rights or remedies of the Purchasers under the Agreement or of the Lender under the Des Plaines Loan Documents.

24

42.     Notwithstanding anything herein to the contrary, nothing in this Order shall authorize or be deemed (i) an assumption and assignment of the lease (the "Oak Street Lease") on the property located at 114 East Oak Street, Chicago, IL (the "Oak Street Property") and (ii) a sale of any equipment, machinery, or other property located at the Oak Street Property on which Hibernian Direct, LLC asserts a valid lien or encumbrance. Hibernian acknowledges that the "other property" in which it is asserting a lien does not include either (i) inventory, or (ii) signs and personal property that are proprietary to brands that constitute Acquired Assets under the Agreement. The Court is not making any findings, conclusions or determinations as to whether any property or equipment located at the Oak Street Property constitutes improvements or personal property. Any and all issues, rights, remedies and defenses with respect thereto are hereby reserved pending further order of the Court.

43.     Notwithstanding anything herein to the contrary, nothing in this Order shall be or be deemed an assumption or assignment of the Clothing License Agreement between Burberrys Limited and Hart Schaffner & Marx, Hickey-Freeman Company, and HartMarx Corporation made as of January 1, 1997 (as amended) (the "Burberry License Agreement"), and no assumption or assignment of the Burberry License Agreement shall be approved absent further order of this Court or agreement between Burberry Limited ('Burberry") and the Purchasers, which agreement, if entered into, shall not require any further order of the Court. Nothing herein shall be deemed a waiver of any rights or remedies of the Purchasers under the Agreement.

44.     Nothing herein shall be deemed to adjudicate, waive, or otherwise affect any of the rights of Burberry Limited with respect to (i) the Burberry License Agreement; (ii) any and all arguments set forth in Burberry's Objection to Assumption and/or Assignment of

Burberry's Trademark License to Purchasers in Connection with Sale of Debtors' Assets filed on

June 19, 2009; (iii) Burberry's motion for relief from the stay to terminate the Burberry License

Agreement filed on April 3, 2009; or (iv) Objection of Burberry Limited to Notice of Cure

Amount with Respect to Executory Contracts or Unexpired Leases Potentially to be Assumed

and Assigned in Connection with Sale of Debtors' Assets filed on June 19, 2009. All issues,

rights, remedies and defenses of all interested parties with respect to the foregoing objection and

motion are hereby preserved. The hearing on the foregoing objection and motion shall be

continued to July 6, 2009 at 9:15 a.m.; status hearing on this matter on July 2, 2009 at 2:00 p.m.

45.     Notwithstanding anything to contained herein or in the Agreement to the

contrary, the only personal property currently located at the warehouse in Michigan City, Indiana

that the Purchasers will acquire from the Debtors are two TEMXC121 Embroidery Machines

with software, acquired by the Debtors in 2008. The Purchasers shall remove that property in a

business and workmanlike manner.

46.     Nothing contained in any order entered in the Chapter 11 Cases

subsequent to entry of this Order, nor in any chapter 11 plans confirmed in these Chapter 11

Cases, shall conflict with or derogate from the provisions of the Agreement or the terms of this

Order.

47.     Notwithstanding rules 6004(h), 6006(d), 7062, or 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") or any other Bankruptcy Rule or rule

62(a) of the Federal Rules of Civil Procedure, this order shall be immediately effective and

enforceable upon its entry and there shall be no stay of execution of this order.

48.     The provisions of this Order are nonseverable and mutually dependent.

1326049.1

49.     To the extent that any provision of this Order conflicts with the Agreement, this Order shall control.

As stated on the record at the Sale Hearing, and notwithstanding any provision in this Order or the Agreement to the contrary, the Parties (Debtors, Purchasers, the Committee, and Prepetition Secured Lenders) have agreed, and approval of the Sale is conditioned upon, the following terms, the enforcement of which the Court maintains jurisdiction:

I.     Through and including the date immediately prior to the Closing Date, the Prepetition Secured Lenders shall:

(a)     fund the disbursements set forth in the previously approved operating budget provided for in the Agreement (consistent with prior practices in these Chapter 11 Cases), in accordance with the "DIP Order" dated February 19, 2009 (Dkt. No. 149) and the Financing Agreements (as defined in the DIP Order),

(b)     to the extent not already accomplished pursuant to the DIP Financing, separately fund and pay the Professional Fee Carve Out, as such term is defined in the DIP Order,

(c)     agree that any claims they may have after receipt and application to the Obligations (as defined in the DIP Order) of all proceeds from the Sale or other Collateral (as defined in the DIP Order) shall be treated as general, unsecured (non-priority) claims under the Bankruptcy Code,

27

(d)     on the date immediately prior to Closing, fund to the Debtors, in accordance with the DIP Order and the Financing Agreements, all budgeted disbursements that remain unpaid as of such date (or estimated to be unpaid through to the Closing), which funded amount shall be used to pay any budgeted items, and

(e)     be entitled to include all amounts funded pursuant to (a) - (d) above as part of the DIP Loan Balance.

II.     In addition to the obligations contained in the Agreement, Purchasers shall, not later than sixty (60) days after the Closing, assume and pay any unpaid administrative claims accrued as of the Closing entitled to priority under section 503 and 507 of the Bankruptcy Code up to an amount of $2,000,000.

III.    At the Closing, an amount equal to the proceeds of the Fifth Avenue Termination Agreement (approximately $12,000,000) shall be remitted to Wachovia and placed in a segregated account at Wells Fargo Bank and not disbursed to the DIP Lenders except pursuant to further order of this Court, the Parties agreeing that such account is established to satisfy any judgment or recovery obtained in relation to the adversary proceeding in this Court identified as No. 09-A-0458.

IV.     Following the Closing, counsel for the Debtors and Committee shall prepare a joint plan of liquidation (the "Plan"), which Plan shall provide that the Avoidance Actions(as defined in the DIP Order) shall be controlled and prosecuted by representatives of the Estates' unsecured creditors (i.e., the Committee or its successors under the Plan) reasonably acceptable to Debtors.

28

Dated: Chicago, Illinois
       JUNE 25 , 2009


                              _____
                              UNITED STATES BANKRUPTCY JUDGE

1326049.1

**Exhibit A to Sale Order**

|     | Agreement Description | Cure Amount |
| --- | --- | --- |
| 1. | Vendor Agreement, dated December 31, 2008, between Pinehurst, Inc. and Bobby Jones division of Hickey-Freeman, Co. | $0.00 |
| 2. | Virtual Vendor Agreements, dated December 15, 2006, between Hickey-Freeman Co. and its Bobby Jones division and Army and Air Force Exchange Service (AAFES). | $0.00 |
| 3. | Virtual Vendor Agreement, dated October 15, 2007, between Hart Schaffner & Marx and Army and Air Force Exchange Service (AAFES). | $0.00 |
| 4. | Sales agreement, dated November 12, 2007, between Doral Golf Resort and Spa and Bobby Jones division of Hickey-Freeman Co. | $0.00 |
| 5. | Vendor Commission Agreement, dated August 8, 2008, between Big and Tall Associates and Hart Schaffner & Marx. | $0.00 |
| 6. | Vendor Commission Agreement of unknown date, between Big and Tall Associates and Hickey-Freeman. | $0.00 |
| 7. | Vendor Agreement, dated November 21, 2008, between Monarchy Group, Inc. and American Laundry. | $0.00 |
| 8. | Vendor Agreement, dated December 5, 2008, between Monarchy Group, Inc. and Angel's Fashion. | $0.00 |
| 9. | Vendor Agreement, dated January 6, 2009, between Monarchy Group, Inc. and C Need Inc. | $0.00 |
| 10. | Vendor Agreement, dated November 25, 2008, between Monarchy Group, Inc. and Cal Stitch Inc. | $0.00 |
| 11. | Vendor Agreement, dated December 2, 2008, between Monarchy Group, Inc. and Carillo's Cutting Services. | $0.00 |
| 12. | Vendor Agreement, dated November 26, 2008, between Monarchy Group, Inc. and Chavez Factory Silkscreening Inc. | $0.00 |
| 13. | Vendor Agreement, dated December 3, 2008, between Monarchy Group, Inc. and Finishing Solutions Inc. | $0.00 |
| 14. | Vendor Agreement, dated December 1, 2008, between Monarchy | $0.00 |

| | Agreement Description | Cure Amount |
|---|---|---|
| | Group, Inc. and Fulcrum International Inc. | |
| 15. | Vendor Agreement, dated November 18, 2008, between Monarchy Group, Inc. and Golden State Finishing House Inc. | $0.00 |
| 16. | Vendor Agreement, dated November 11, 2008, between Monarchy Group, Inc. and Grace Apparel USA, Inc. | $0.00 |
| 17. | Vendor Agreement, dated November 20, 2008, between Monarchy Group, Inc. and Loops of L.A., Inc. | $0.00 |
| 18. | Vendor Agreement, dated November 26, 2008, between Monarchy Group, Inc. and Motion Time Management, Inc. | $6,335.00 |
| 19. | Vendor Agreement, dated December 30, 2008, between Monarchy Group, Inc. and Premium Laundry Plus, Inc. | $3,225.00 |
| 20. | Vendor Agreement, dated November 21, 2008, between Monarchy Group, Inc. and Pro Wash Inc. | $70,051.00 |
| 21. | Vendor Agreement, dated November 25, 2008, between Monarchy Group, Inc. and Proyecto Imperial Inc. | $0.00 |
| 22. | Vendor Agreement, dated December 3, 2008, between Monarchy Group, Inc. and Sewing Trends Inc. | $0.00 |
| 23. | Vendor Agreement, dated December 3, 2008, between Monarchy Group, Inc. and Stitch Factory. | $0.00 |
| 24. | Vendor Agreement, dated November 11, 2008, between Monarchy Group, Inc. and Supreme Rag Jeans. | $0.00 |
| 25. | Vendor Agreement, dated November 17, 2008, between Monarchy Group, Inc. and W.M.S.E., Inc. | $0.00 |
| 26. | Contractor Agreement, dated August 11, 2008, between Simply Blue Apparel, Inc. and Bianca Fashion Limited. | $0.00 |
| 27. | Contractor Agreement, dated August 12, 2008, between Simply Blue Apparel, Inc. and Tailor Denim Studio Company Limited. | $0.00 |
| 28. | Contractor Agreement, dated August 12, 2008, between Simply Blue Apparel, Inc. and Wayfoon Garment Limited. | $0.00 |
| 29. | Contractor Agreement, dated August 9, 2008, between Simply Blue | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | Apparel, Inc. and Linson Gmt Fty. Ltd. | |
| 30. | Contractor Agreement, dated August 12, 2008, between Simply Blue Apparel, Inc. and Well Creation Development Ltd. | $0.00 |
| 31. | Contractor Agreement, dated August 20, 2008, between Simply Blue Apparel, Inc. and Maxwell Far East Ltd. | $0.00 |
| 32. | Contractor Agreement, dated August 8, 2008, between Simply Blue Apparel, Inc. and Lon Fat Garment Factory Ltd. | $0.00 |
| 33. | Trademark License Agreement, dated June 1, 1997, among Jonesheirs, Inc., Hickey-Freeman Co., Inc. and Callaway Golf Company. | $78,159.00 to Calloway $92,239.00 to Jonesheirs |
| 34. | Exclusive Licensing Agent Agreement, dated January 1, 2003, between Jonesheirs, Inc., Hartmarx Corporation and Hickey-Freeman Co., Inc. | $0.00 |
| 35. | License Agreement, dated April 1, 2007, between Bobby Jones, a division of Hickey-Freeman Company, Inc. and NFL Properties LLC. | $10,866.91 |
| 36. | License Agreement, effective January 1, 2008, between Bobby Jones, a division of Hickey-Freeman Company, Inc. and IMG Worldwide, Inc., on behalf of PGA Tour, Inc., as amended by First Amendment to the License Agreement, dated November 10, 2008, between Bobby Jones, a division of Hickey-Freeman Company, Inc. and IMG Worldwide, Inc, on behalf of PGA Tour, Inc. | $15.44 to IMG |
| 37. | Master Manufacturers' Agreement, dated April 22, 1998, between Bobby Jones, sportswear division of Hickey-Freeman Co., Inc. and the United States Golf Association, including Addendum to Master Manufacturers' Agreement, dated January 20, 2009, between Bobby Jones, Sportswear Division of Hickey-Freeman Company, Inc. and the United States Golf Association. | $22.75 to USGA |
| 38. | Trademark License Agreement, dated January 1, 2002, between Austin Reed Limited and HMX Sportswear, Inc. | $37,180.19 |
| 39. | License Agreement, dated November 7, 2008, between S.A.R.L. de Gestion Pierre Cardin and Intercontinental Apparel, Inc. | $148,666.00 |
| 40. | License Agreement, dated September 1, 1972, between S.A.R.L. de Gestion Pierre Cardin and Intercontinental Apparel, Inc., as assigned and amended by Amendment of Agreement, dated July 1, 1973, | $0.00 |

| | Agreement Description | Cure Amount |
|---|---|---|
| | between S.A.R.L. Pierre Cardin Ligne Homme and IMAC Corporation, Amendment of and Supplement Agreement, dated August 21, 1974, between S.A.R.L. de Gestion Pierre Cardin and IMAC Corporation, and Amendment of Agreement, dated July 1, 1988, between S.A.R.L. de Gestion Pierre Cardin and Intercontinental Apparel, Inc. | |
| 41. | 2001 Master Agreement, dated October 18, 2000, among Golden Bear Golf, Inc., Golden Bear Apparel International, Inc. and Jaymar-Ruby, Inc. d/b/a Trans-Apparel Group, Hart Schaffner & Marx, HMX Sportswear, Inc. and Hartmarx Corporation, as amended by Amendment to 2001 Master Agreement, dated December 22, 2003, among Golden Bear Golf, Inc., Golden Bear Apparel International, Inc., Hart Schaffner & Marx, HMX Sportswear, Inc. and Hartmarx Corporation. | $0.00 |
| 42. | 2001 Apparel License Agreement, dated October 18, 2000, among Golden Bear Golf, Inc., Hart Schaffner & Marx and HMX Sportswear, as successor in interest to Jaymar Ruby, Inc. d/b/a Trans-Apparel Group, as amended by Amendment to 2001 Apparel License Agreement, dated December 22, 2003, among Golden Bear Golf, Inc., Hart Schaffner & Marx and HMX Sportswear. | $600,000 (which includes all minimum royalty payments due and owing as of July 1, 2009), to be paid in accordance with mutually agreed to terms, plus any additional amounts that may be owed under the agreement |
| 43. | Jack Nicklaus Apparel International 2005 Joint Venture Agreement, dated December 22, 2003, between Golden Bear Apparel International, Inc. and Seaford Clothing Co. | $0.00 |
| 44. | Trademark License Agreement, dated June 1, 1972, between Austin Reed Limited and Hart Schaffner & Marx, as amended by First Supplement to Trademark License Agreement, effective as of 1986, between Austin Reed Limited and Hart Schaffner & Marx, Second Supplement to Trademark License Agreement, dated April 1, 1992, between Austin Reed Limited and Hart Schaffner & Marx, and Third Supplement to Trademark License Agreement, dated June 1, 1993, between Austin Reed Limited and Hart Schaffner & Marx. | Notwithstanding anything else to the contrary in the Sale Order, the aggregate cure amount for the assumption and assignment of all Trademark License agreements with Austin Reed shall be $301,885.96, payable on the terms mutually agreed to by the parties, for all prepetition |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | | amounts owed through January 23, 2009; plus all unpaid post-petition royalties accrued and owing under the applicable agreements after January 23, 2009, for which amounts the applicable Purchaser assignee shall be liable and shall be discussed and mutually agreed to by the parties |
| 45. | Amended and Restated License Agreement, dated January 1, 2002 between L.C. Licensing, Inc. and M. Wile & Company (d/b/a HMX Tailored), as amended by First Amendment to Amended and Restated License Agreement, dated November 16, 2004, between L.C. Licensing, Inc. and M. Wile & Company (d/b/a HMX Tailored), Renewal and Second Amendment to Amended and Restated License Agreement, dated January 31, 2007, between L.C. Licensing, Inc. and M. Wile & Company (d/b/a HMX Tailored), and Third Amendment to Amended and Restated License Agreement, dated June 9, 2008, between L.C. Licensing, Inc. and M. Wile & Company (d/b/a HMX Tailored). | $462,023.00 |
| 46. | Trademark License Agreement, dated July 1, 2004, between Jeffrey Banks, Ltd. and M. Wile & Company, Inc., as amended by Letter Amendment to Trademark License Agreement, dated February 7, 2007, between Jeffrey Banks, Ltd. and M. Wile & Company, Inc. (d/b/a HMX Tailored). | $225.00 |
| 47. | Trademark License Agreement, dated August 1, 1981, between Austin Reed Limited and International Women's Apparel, Inc. (as successor licensee to Hart Schaffner & Marx), as amended by Amendment to Trademark License Agreement, dated January 1, 1989, between Austin Reed Limited, Hartmarx Retail Marketing and Merchandising Corporation, and Letter Agreement, dated August 28, 1991, between Austin Reed Limited, Hartmarx Retail Marketing and Merchandising Corporation. | Notwithstanding anything else to the contrary in the Sale Order, the aggregate cure amount for the assumption and assignment of all Trademark License agreements with Austin Reed shall be $301,885.96, payable on the terms mutually agreed to by the parties, |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | | for all prepetition amounts owed through January 23, 2009; plus all unpaid post-petition royalties accrued and owing under the applicable agreements after January 23, 2009, for which amounts the applicable Purchaser assignee shall be liable and shall be discussed and mutually agreed to by the parties |
| 48. | Bobby Jones Trademark Sublicense Agreement, dated September 27, 2004, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Seiko Instruments USA, Inc. d/b/a/ SII Marketing International, as amended by First Amendment and Renewal of Bobby Jones Trademark Sublicense Agreement, dated January 1, 2008, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Seiko Instruments USA, Inc. d/b/a/ SII Marketing International. | $0.00 |
| 49. | Bobby Jones Trademark Sublicense Agreement, dated October 1, 2008, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Markland Marketing, Inc. | $0.00 |
| 50. | Bobby Jones Trademark License Agreement, dated January 1, 2008, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Bobby Jones Lifestyle Ltd. | $0.00 |
| 51. | Trademark License Agreement, dated January 15, 2004, among Hartmarx Corporation, Jonesheirs, Inc., and The Bobby Jones Golf Company, LLC, as amended by First Amendment to Trademark License Agreement, dated January 1, 2008, among Hartmarx Corporation, Jonesheirs, Inc., and The Bobby Jones Golf Company, LLC, with related agreement, Bobby Jones Golf Trademark Sublicense Agreement, dated September 15, 2007, between The Bobby Jones Golf Company, LLC and Bobby Jones (Europe) Limited. | $0.00 |
| 52. | 1994 Restated Hickey-Freeman Trademark License Agreement, dated December 30, 1993, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Trenza Limited, as amended by | $0.00 |

| | Agreement Description | Cure Amount |
|---|---|---|
| | 1999 Renewal of Hickey-Freeman Trademark License Agreement, dated November 30, 1998, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Trenza Limited, 2004 Renewal of Hickey-Freeman Trademark License Agreement, dated December 22, 2003, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Trenza Limited, and 2009 Renewal of Hickey-Freeman Trademark License Agreement, dated November 24, 2008, among Hickey-Freeman Co., Inc., Hartmarx International, Inc. and Trenza Limited. | |
| 53. | Hart Schaffner Marx License Agreement, dated August 3, 2007, among Hart Schaffner & Marx, Hartmarx International, Inc. and J.A. Besner & Sons (Canada) Ltd. | $0.00 |
| 54. | Hart Schaffner Marx License Agreement, dated September 1, 2004, among Hart Schaffner & Marx, Hartmarx International, Inc. and Cardinal Clothes, Inc., as amended by First Amendment to Hart Schaffner Marx License Agreement, dated June 20, 2006, among Hart Schaffner & Marx, Hartmarx International, Inc. and Cardinal Clothes, Inc., and Second Amendment to Hart Schaffner Marx License Agreement, dated August 20, 2007, among Hart Schaffner & Marx, Hartmarx International, Inc. and Cardinal Clothes, Inc. | $0.00 |
| 55. | Hart Far Eastern Textile Technical Cooperation Agreement, dated March 30, 1989, between Hart Schaffner & Marx and Far Eastern Textile, Ltd., as amended by First Amendment to Technical Cooperation Agreement, dated May 1, 1990, between Hart Schaffner & Marx and Far Eastern Textile, Ltd., Second Amendment to Technical Cooperation Agreement, dated July 1, 1994, between Hart Schaffner & Marx and Far Eastern Textile, Ltd., Third Amendment to Technical Cooperation Agreement, dated July 1, 1999, between Hart Schaffner & Marx and Far Eastern Textile, Ltd., and Fourth Amendment to Technical Cooperation Agreement, dated July 1, 2004, between Hart Schaffner & Marx and Far Eastern Textile, Ltd. | $0.00 |
| 56. | Signature Eyewear, Inc. Hart Schaffner & Marx License Agreement, dated January 12, 1996, between Hart Schaffner & Marx and Signature Eyewear, Inc., as amended by First Amendment to License Agreement, dated December 15, 1998, between Hart Schaffner & Marx and Signature Eyewear, Inc., Second Amendment to and Renewal of License Agreement, dated April 9, 1999, between Hart Schaffner & Marx and Signature Eyewear, Inc., Third Renewal of License Agreement, dated July 1, 2005, between Hart Schaffner & Marx and Signature Eyewear, Inc., and Fourth Renewal of | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | License Agreement, dated January 1, 2009, between Hart Schaffner & Marx and Signature Eyewear, Inc. | |
| 57. | Hart Schaffner Marx License Agreement, dated June 1, 2002, between Hart Schaffner & Marx, Hartmarx International, Inc. and Superba, Inc., as amended and assigned to Phillips-Van Heusen Corporation by Consent Agreement, dated September 27, 2006, between Hart Schaffner & Marx and Superba, Inc. | $0.00 |
| 58. | Hart Schaffner Marx Marketing and Services Agreement, dated December 15, 2006, among Hart Schaffner & Marx, Hartmarx International, Inc. and Youngor Dresses Co., Ltd., as amended. | $0.00 |
| 59. | Sansabelt Technology Transfer Agreement, dated December 1, 2001, among Jaymar-Ruby, Inc. dba Trans-Apparel Group, Inc., Hartmarx International, Inc. and Coppley Apparel Group Limited, as amended. | $0.00 |
| 60. | Sansabelt Trademark License Agreement, dated April 1, 2006, among Jaymar-Ruby, Inc. d/b/a Trans-Apparel Group, Inc., Hartmarx International, Inc. and Yale de Mexico, S.A. de C.V. | $0.00 |
| 61. | 2006 Pierre Cardin Trademark License Agreement, dated November 1, 2006, among Intercontinental Apparel, Inc., Hartmarx International, Inc. S.A.R.L. De Gestion Pierre Cardin and Falabella Colombia S.A. | $0.00 |
| 62. | Retailer license agreement dated, December 23, 2008, between Monarchy Group, Inc. and Vector SP. Z.O.O. | $0.00 |
| 63. | e-business Hosting Agreement, dated June 29, 2006, between International Business Machines Corporation and Hart Schaffner & Marx, as amended by the Project Change Request Form, dated December 18, 2006, between International Business Machines Corporation and Hart Schaffner & Marx. | $111,568.00 |
| 64. | Master Services Agreement, effective July 18, 2007, between SAVVIS Communications Corporation and Hart Schaffner & Marx, as appended. | $151,314.00 |
| 65. | Inovis Services Agreement Nos. 1-41040895 and 41040930 of unknown date between Inovis, Inc. and Hart Schaffner & Marx d/b/a HMX Tailored (on behalf of itself and its affiliates). | $9,554.16 |
| 66. | Agreements of various dates with Manufacturers and Traders Trust | $590.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | Co. for use of online Infocu$ information-reporting/transaction initiation services with Exclusively Misook division of M. Wile & Company, Inc.; Hart Schaffner & Marx; Jaymar-Ruby, Inc.; National Clothing Co.; Hartmarx Corporation; Hickey-Freeman Co., Inc.; HMX Luxury, Inc.; International Women's Apparel, Inc.; Simply Blue Apparel, Inc. and HMX Sportswear. | |
| 67. | Software License Maintenance Agreement Contract No. 2089, dated June 11, 1999, between Scheme Software Corp. and Exclusively Misook. | $0.00 |
| 68. | Multi-Channel Fulfillment Services Agreement, dated September 1, 2008, between Fulfillment Systems, Inc. and Direct Route Marketing Corporation d/b/a Barrie Pace, Ltd. | $0.00 |
| 69. | Master Services Agreement dated April 4, 2006 between USA.NET, Inc. and Hart Schaffner & Marx d/b/a HMX Tailored. | $8,203.00 |
| 70. | Master Services Agreement, dated June 1, 2008, and related Statement of Work, dated October 7, 2008, between Where 2 Get It, Inc. and Hart Schaffner & Marx. | $0.00 |
| 71. | Corporate Software and Services Renewal Contract, dated September 10, 2008, between Thomson Reuters (Tax and Accounting), Inc. and Hartmarx Corporation. | $0.00 |
| 72. | Service Agreement, dated May 10, 2007, between Advance 2000, Inc. and Hickey-Freeman. | $273.39 |
| 73. | Agreement CatA of unknown date and related Addendum to CatA Catalogue Services, dated March 28, 2007, between InterTrade Technologies Inc. and Hickey-Freeman. | $0.00 |
| 74. | Sales Tax Management Services proposal from Avalara, accepted on August 15, 2008, by International Women's Apparel. | $0.00 |
| 75. | Sales Representation Agreement, dated January 1, 2008, between HMX Sportswear, Inc. and John A. Lano. | $0.00 |
| 76. | Sales Representation Agreement, dated June 1, 2008, between HMX Sportswear, Inc. and Warren F. Mack, Jr. | $0.00 |
| 77. | Sales Representation Agreement, dated January 2, 2007, between HMX Sportswear, Inc. and Masters United X, Inc. | $0.00 |
| 78. | Sales Representation Agreement, dated January 1, 2008, between | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | HMX Sportswear, Inc. and Rob G. Nicholson. | |
| 79. | Sales Representation Agreement, dated December 1, 2004, between HMX Sportswear, Inc. and Nancy Pentiuk, as amended by First Amendment to Sales Representation Agreement, dated October 22, 2006, between HMX Sportswear, Inc. and Nancy Pentiuk, as amended by Second Amendment to Sales Representation Agreement, dated September 1, 2008, between HMX Sportswear, Inc. and Nancy Pentiuk. | $0.00 |
| 80. | Sales Representation Agreement, dated January 1, 2009, between HMX Sportswear, Inc. and Adam J. Robinson. | $0.00 |
| 81. | Sales Representation Agreement, dated August 29, 2006, between HMX Sportswear, Inc. and Drewery Scott Scearce III, as amended by First Amendment to Sales Representation Agreement, dated July 1, 2007, between HMX Sportswear, Inc. and Drewery Scott Scearce III, as amended by Second Amendment to Sales Representation Agreement, dated June 1, 2008, between HMX Sportswear, Inc. and Drewery Scott Scearce III. | $0.00 |
| 82. | Sales Representation Agreement, dated August 1, 2007, between HMX Sportswear, Inc. and Kathryn W. Smith, as amended by First Amendment to Sales Representation Agreement, dated December 1, 2008, between HMX Sportswear, Inc. and Kathryn W. Smith. | $0.00 |
| 83. | Sales Representation Agreement, dated July 1, 2007, between HMX Sportswear, Inc. and Rose St. Pierre. | $0.00 |
| 84. | Bobby Jones Independent Representative New/Change Form, dated June 29, 2006. (Larry Lyda) | $0.00 |
| 85. | Bobby Jones Independent Representative New/Change Form, dated October 13, 2006. (Glen Maurer) | $0.00 |
| 86. | Bobby Jones Compensation Agreement, dated December 21, 2007. (Jon Montei) | $0.00 |
| 87. | Bobby Jones Sales Representative Agreement, dated December 1, 2007. (Michael Novak) | $0.00 |
| 88. | Bobby Jones Sales Representative Agreement, dated January 13, 2008. (Sabayrac and Son's Inc) | $0.00 |
| 89. | Bobby Jones Independent Representative New/Change Form, dated | $0.00 |

| | Agreement Description | Cure Amount |
|---|---|---|
| | January 1, 2007. (Ron Salas) | |
| 90. | Bobby Jones Sales Representative Agreement, dated December 1, 2007. (Cameron Todd) | $0.00 |
| 91. | Bobby Jones Independent Representative New/Change Form, dated August 1, 2006. (Tricia Lee) | $0.00 |
| 92. | Bobby Jones Sales Representative Agreement, dated January 13, 2008. (Thomas VanHaaren) | $0.00 |
| 93. | Bobby Jones Compensation Agreement, dated May 1, 2008. (Chris Warren) | $0.00 |
| 94. | Hickey-Freeman Graduate School Program Service Agreement for 2008-2009-2010 school year at UCLA (Ravi K. Sreerama) | $0.00 |
| 95. | Independent Wholesale Sales Representative Agreement, dated May 25, 2004, between Simply Blue Apparel, Inc. and David Byrne. | $0.00 |
| 96. | Independent Wholesale Sales Representative Agreement, dated April 1, 2006, between Simply Blue Apparel, Inc. and MRM and Associates. | $0.00 |
| 97. | Independent Wholesale Sales Representative Agreement, dated April 1, 2004, between Simply Blue Apparel, Inc. and Matt Reimer. | $0.00 |
| 98. | Independent Wholesale Sales Representative Agreement, dated June 3, 2003, between Simply Blue Apparel, Inc. and Michael B. Rothstein. | $0.00 |
| 99. | Independent Wholesale Sales Representative Agreement, dated April 1, 2006, between Simply Blue Apparel, Inc. and Jon Tedford. | $0.00 |
| 100. | Independent Wholesale Sales Representative Agreement, dated May 25, 2004, between Simply Blue Apparel, Inc. and Larry Traub. (Chistopher Blue) | $0.00 |
| 101. | Independent Wholesale Sales Representative Agreement, dated December 1, 2006, between Simply Blue Apparel, Inc. and Larry Traub. (Worn Men's Jeans) | $0.00 |
| 102. | Independent Wholesale Sales Representative Agreement, dated April 1, 2006, between Simply Blue Apparel, Inc. and Max Watkins. | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| 103. | Independent Wholesale Sales Representative Agreement, dated April 1, 2006, between Simply Blue Apparel, Inc. and The Wermers Company. | $0.00 |
| 104. | Independent Wholesale Sales Representative Agreement, dated April 1, 2006, between Simply Blue Apparel, Inc. and Five Star Trading/Stan Shindler. | $0.00 |
| 105. | Independent Wholesale Sales Representative Agreement, dated September 2007, between Simply Blue Apparel, Inc. and Karen George. | $0.00 |
| 106. | Independent Wholesale Sales Representative Agreement, dated January 1, 2007, between Simply Blue Apparel, Inc. and Nancy Huber. | $0.00 |
| 107. | Independent Wholesale Sales Representative Agreement, dated December 1, 2006, between Simply Blue Apparel, Inc. and Tom Windram. | $0.00 |
| 108. | Unwritten independent contractor arrangements for wholesale selling services between Simply Blue Apparel, Inc. and (i) Deb Albersman, (ii) Charlie Albert, (iii) Laurie Barokas, (iv) Don Doughman, (v) Lynda Easter, (vi) Ron Gaon, (vii) Jerry Hoffman, (viii) Ben Muns, (ix) Bruce Butler, (x) David Lewin, (xi) Terry Reynolds, and (xii) Kristi Williams. | $0.00 |
| 109. | Unwritten independent contractor arrangement for graphic arts services between Simply Blue Apparel, Inc. and Brigid Bender. | $0.00 |
| 110. | Unwritten independent contractor arrangement for pattern-making services with Steve Ostrian. | $2,528.00 |
| 111. | Supplier Authorization and Sales Representation Agreement, dated January 16, 2006, between Colony Group, Inc. and Bobby Jones division of Hickey-Freeman Co. | $0.00 |
| 112. | Business Credit Services Agreement, dated January 9, 2009, between Experian Information Solutions, Inc. and Hickey-Freeman Co. | $0.00 |
| 113. | MyBuys Service Agreement, dated July 31, 2008, between MyBuys, Inc. and HMX Luxury, Inc. | $0.00 |
| 114. | Supplier Agreement, dated September 5, 2008, between | $0.00 |

| | Agreement Description | Cure Amount |
|---|---|---|
| | Overstock.com, Inc. and HMX Luxury, Inc. | |
| 115. | Targeted email marketing agreement, dated December 12, 2008, between UniteU Technologies, Inc. and Hickey-Freeman Co. | $24,356.00 |
| 116. | Buying Agency Agreement, dated August 1, 2007, between Simply Blue Apparel, Inc. and Indigo Visions (HK) Limited. | $32,772.00 |
| 117. | Buying Agency Agreement, dated November 14, 2007, between Golden Bough & Co. and Hickey-Freeman Co. | $6,657.05 |
| 118. | Buying Agency Agreement, dated February 2, 2006, between GTFD Unltd. and Hickey-Freeman Co. | $0.00 |
| 119. | Buying Agency Agreement, dated November 3, 2005, between M. Magtague International, Ltd. and Hickey-Freeman Co. | $36,195.32 |
| 120. | Buying Agency Agreement, dated April 2002, between Studio AD, SAS and Hickey-Freeman Co. | $32,209.00 |
| 121. | Motor Vehicle Lease Agreement, dated December 4, 2007, between Rallye Motors and Hickey-Freeman Co. (Paulette Garafalo) | $0.00 |
| 122. | Motor Vehicle Lease Agreement dated December 27, 2007 between Pichler Pontiac Corp. and Hickey-Freeman Co. (Chris Linares) | $0.00 |
| 123. | Motor Vehicle Lease Agreement, dated November 29, 2006, between Prestige BMW and Hickey-Freeman Co. (Jon Morales) | $0.00 |
| 124. | Motor Vehicle Lease Agreement, dated November 10, 2006, between Honda Financial Services and HMX Sportswear. (Eric Prengel) | $0.00 |
| 125. | Motor Vehicle Lease Agreement, dated December 13, 2008, between BMW Financial Services NA, LLC and Hartmarx Corporation. (Glenn Morgan). | $0.00 |
| 126. | Motor Vehicle Lease Agreement, dated June 30, 2008, between Daimler Chrysler Financial Services and Hartmarx Corporation. (Homi Patel) | $0.00 |
| 127. | Motor Vehicle Lease Agreement, dated April 19, 2007, between Lexus Financial Services and Hartmarx Corporation. (Taras Proczko) | $0.00 |
| 128. | Motor Vehicle Lease Agreement, dated April 19, 2007, between US | $0.00 |

Doc. # CC-208531 v.1

|      | Agreement Description | Cure Amount |
|------|----------------------|-------------|
|      | Bank and Hart Schaffner & Marx. (Lennart Bjorklund) |  |
| 129. | Motor Vehicle Lease Agreement, dated July 17, 2008, between Lexus Financial Services and M. Wile & Company. (Steve Weiner) | $0.00 |
| 130. | Motor Vehicle Lease Agreement, dated July 27, 2006, between Lexus Financial Services and Hartmarx Corporation. (Bruce Bellusci) | $0.00 |
| 131. | Water Treatment (Boiler) Agreement, dated September 1, 2008, between Rochester Midland Corporation and Hickey-Freeman Co. | $812.44 |
| 132. | Compressed Air Service Agreement, dated November 18, 1993, between R. W. Lindsay, Inc. and Hickey-Freeman Co. | $0.00 |
| 133. | Copier Lease, dated April 2007, between Xerox and Hickey-Freeman Co. | $6,439.56 |
| 134. | Copier Maintenance & Supply Agreements, dated November 2007, between Toshiba Business Solutions and Hickey-Freeman Co. (agreement 1) | $1,862.00 |
| 135. | Copier Maintenance & Supply Agreements, dated November 2007, between Toshiba Business Solutions and Hickey-Freeman Co. (agreement 2) | $0.00 |
| 136. | Copier Maintenance & Supply Agreement dated January 2008 between Toshiba Business Solutions and Hickey-Freeman Co. | $0.00 |
| 137. | Equipment Maintenance Agreement, dated March 2005, between Danka and Hickey-Freeman. | $342.16 |
| 138. | Equipment Guaranteed Maintenance Agreement, dated November 2006, between ComDoc and Hickey-Freeman Co. | $229.48 |
| 139. | Copier Maintenance Agreement, dated July 2003, between Atlantic Tomorrows Office and Hickey-Freeman Co. (NYC office) | $75.31 |
| 140. | Subscription Agreement for PowerMax Service Package, dated May 2007, between Lectra USA, Inc. and Hickey-Freeman Co. (cutting room equipment) | $768.76 |
| 141. | Technical Services and Support Agreement, dated January 1, 2009, between Methods Workshop and Hickey-Freeman Co. (cutting room equipment) | $165.75 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| 142. | Elevator Maintenance Agreement, dated August 18, 1998, between Downey-Goodlein Elevator Corp. and Hickey-Freeman Co. | $2,646.89 |
| 143. | Fire Inspection Agreement, dated June 10, 2008, between Davis-Ulmer and Hickey-Freeman Co. | $1,177.56 |
| 144. | Preventive maintenance agreement, dated December 2007, between Swiftlift, Inc. and Hickey-Freeman Co. (fork and pallet truck) | $0.00 |
| 145. | Internet Service Agreement, dated November 10, 2008, between Frontier and Hickey-Freeman Co. (for 1225 Jefferson Rd. store) | $0.00 |
| 146. | Maintenance Service Agreement, dated as of January 1, 2009, between Computer Generated Solutions, Inc. and Hickey-Freeman (for BlueCherry Leadtec programs) | $905.65 |
| 147. | Production equipment lease between YKK U.S.A., Inc. and Hickey-Freeman Co. (paid quarterly) | $1,710.00 |
| 148. | Mailing machine lease and service agreement, dated March 13, 2007, between Pitney Bowes and Hickey-Freeman Co. | $0.00 |
| 149. | Parking garage agreement, dated December 10, 2007, between GGMC Parking, LLC and Hickey-Freeman Co. | $0.00 |
| 150. | Pest Control Service Agreement, dated November 2008, between Flower City and Hickey-Freeman Co. | $774.60 |
| 151. | Snow Removal and Salting Services Agreement, dated October 16, 2007, between Frank's Snow-Plowing and Hickey-Freeman Co. | $4,625.00 |
| 152. | Waste container lease and removal service agreements, dated November 1, 2007, between Waste Management and Hickey-Freeman Co. | $3,315.83 |
| 153. | Water equipment lease and maintenance service agreement, dated July 24, 2006, between Quench and Hickey-Freeman Co. | $500.69 |
| 154. | Wireless inventory scanner service agreement dated March 2008 between Vantage Point Network Systems and Hickey-Freeman Co. | $0.00 |
| 155. | Payroll software support agreement, dated as of January 1, 2009, between Standard Register and Hickey-Freeman Co. | $0.00 |
| 156. | Human Resource Helpline Service Agreement, dated as of January | $0.00 |

Doc. # CC-208531 v.1

| | | Agreement Description | Cure Amount |
|---|---|---|---|
| | | 1, 2009, between HR Works, Inc. and Hickey-Freeman Co. | |
| 157. | | Services Agreement, dated January 1, 1999, between L.C. Licensing, Inc. and Hartmarx International, Inc. | $0.00 |
| 158. | | Business continuity and disaster recovery services; contract no. CFT72MK, between Hartmarx Corporation (for Consolidated Apparel Group, Inc.) and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 159. | | Business continuity and disaster recovery services; contract no. CFT72JK, between Hartmarx Corporation and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 160. | | Business continuity and disaster recovery services; contract no. CFT77DK, between Hartmarx Corporation and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 161. | | Business continuity and disaster recovery services; contract no. CFT6DJL, between Hartmarx Corporation (for International Women's Apparel) and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 162. | | Business continuity and disaster recovery services; contract no. CFT6DKL, between Hartmarx Corporation (for International Women's Apparel) and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 163. | | Business continuity and disaster recovery services; contract no. CFTR4CL, between Hartmarx Corporation (for International Women's Apparel) and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 164. | | Business continuity and disaster recovery services; contract no. CFT72KK between Hartmarx Corporation (for Hickey-Freeman Co.) and IBM Corporation; BCRS Contract Operations. | $0.00 |
| 165. | | Software License for employee appraisals, from Halogen Software, Inc. | $0.00 |
| 166. | | City of Rochester Pre-Development Grant Program agreement, between Hickey-Freeman, Co., Inc. and City of Rochester | $0.00 |
| 167. | | Amended Grant-To-Loan Agreement ($850,000), dated as of September 6, 2005, between City of Rochester and Hickey-Freeman | $0.00 |

Doc. # CC-208531 v.1

|  | Agreement Description | Cure Amount |
|---|---|---|
|  | Co., Inc. |  |
| 168. | Amended Grant-To-Loan Agreement ($350,000), dated as of September 6, 2005, between City of Rochester and Hickey-Freeman Co., Inc. | $0.00 |
| 169. | Agreement for timeclock software support between Advantek Solutions, Inc. and International Women's Apparel, Inc. | $0.00 |
| 170. | Master Services Agreement, with Archer Point. | $3,281.00 |
| 171. | Agreement for EDI related services, with Cleo Communications. | $0.00 |
| 172. | EDI communication one year support renewal, with Cleo Communications. | $0.00 |
| 173. | Application Service Agreement, with CMT. | $0.00 |
| 174. | Agreement for design software, with Colour Matters. | $0.00 |
| 175. | Maintenance service for AS/400, with Competitive Support Options. | $7,711.00 |
| 176. | Agreement for hardware support for AS/400, with Computech and International Women's Apparel, Inc. | $0.00 |
| 177. | Agreement for websense internet filtering, with Distributed Systems Services, Inc. | $0.00 |
| 178. | Agreement for maintenance and support for Smartnet router switches, with Distributed Systems Services, Inc. | $0.00 |
| 179. | Grant Disbursement Agreement, approved February 16, 2005, between Dormitory Authority of the State of New York and Hickey-Freeman Co. | $0.00 |
| 180. | Various IT equipment schedules under Lease Agreement No. F6063, with Forsythe McArthur Associates. | $0.00 |
| 181. | Agreement for EDI related services, with GXS. | $0.00 |
| 182. | Agreement No. 1-41040930 for online catalogue and VAN services. | $7,232.00 $2,322.16 |
| 183. | UPC Catalog in support of Neiman Marcus, with InterTrade | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| | Technologies, Inc. | |
| 184. | Professional Service Agreement, with Jet Reports Inc. | $0.00 |
| 185. | Annual Subscription for Lectra Powermax Services Plan, with Lectra Power Service. | $0.00 |
| 186. | Contract #KUS206250006@6 for design software, with Lectra USA, Inc. | $0.00 |
| 187. | Customer Service Agreement, with Microsoft. | $0.00 |
| 188. | Grant Disbursement Agreement, approved June 16, 2004, between Empire State Development Corporation and Hickey-Freeman Co., Inc. | $0.00 |
| 189. | Agreement for annual maintenance - AR Software, with NMC Technologies. | $0.00 |
| 190. | Agreement for LAN support at Exclusively Misook office, with Noviant. | $270.94 |
| 191. | Solomon Software License, MS SQL 2005 database for Solomon and Crystal Reports report writer for Solomon, with Omnios. | $0.00 |
| 192. | Agreement for dedicated servers for B2B and B2C, with Paetec Business Services. | $3,059.14 |
| 193. | Agreement for software consulting, with Pebblestone Inc. | $0.00 |
| 194. | Agreement for mailing equipment and software lease for NYC office, with Pitney Bowes Global Financial. | $484.57 |
| 195. | Tape back-up storage services, with Recall Total Management. | $2,156.00 |
| 196. | Maintenance of ERP, with Ron Lynn Management. | $0.00 |
| 197. | Agreement for IBM AS400 operating software and hardware maintenance, with Sirus Computer Solutions, Inc. | $0.00 |
| 198. | Agreement for backup and restoration services for mainframe computer, with Sofware Diversified Services. | $3,705.00 |
| 199. | Agreement for electronic storage services (tax), with Thomson Professional & Regulatory Inc. dba RIA. | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| 200. | Agreement for online subscription (tax), with Thomson Professional & Regulatory Inc. dba RIA. | $40,955.00 |
| 201. | Agreement for email outsourcing services, with USA Net Global Emessaing. | $8,203.00 |
| 202. | Agreement for website application services, with Weblinc LLC. | $0.00 |
| 203. | Agreement for website hosting services (terminable on notice), with Weblinc LLC. | $0.00 |
| 204. | Agreement for website design, hosting and business locater services, with Where2GetIt. | $0.00 |
| 205. | Agreement for website development, hosting and maintenance services, with Zappos Com, Inc. | $0.00 |
| 206. | Agreement for internet and email service at 101 N. Wacker Drive, Chicago, Illinois, with ANET Internet Solutions. | $0.00 |
| 207. | Agreement for as-needed repair service for printers at 101 N. Wacker Drive, Chicago, Illinois, with Apex Printer Repair LLC. | $0.00 |
| 208. | Agreement for internet service at 610 Uhler road, Easton, PA, with AT&T. | $0.00 |
| 209. | Agreement for local telephone service at 101 N. Wacker Drive, Chicago, Illinois, with AT&T. | $0.00 |
| 210. | Agreement for as-needed service on Fujitsu telephone switch at 101 N. Wacker Drive, Chicago, Illinois, with ATI Advance Telecommunications of Illinois, Inc. | $0.00 |
| 211. | Agreement for Cisco telecommunications dial-up at 101 N. Wacker Drive, Chicago, Illinois and 1600 Touhy Avenue, Des Plaines, Illinois, with ATT f/k/a SBC. | $0.00 |
| 212. | Agreement for credit card processing services, with Authorize Net. | $0.00 |
| 213. | Agreement for maintenance for ticket printers, with Avery Dennison. | $0.00 |
| 214. | Agreement for dedicated data line between 20 Bridges Rouses road, Rouses Point, New York and New York office, with Bandwith.com. | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| 215. | Agreement for Buffalo Buster cutter, with Boew Bell Howell. | $0.00 |
| 216. | Alternate provider of local telephone service at 101 N. Wacker Drive, Chicago, Illinois, with Broadwing Communications, LLC. | $0.00 |
| 217. | Prepaid support for HP RX2620 server at 101 N. Wacker Drive, Chicago, Illinois through 1/31/2010, with Business Communication Systems of IL. | $0.00 |
| 218. | Agreement for support for ENTEL, with Byte Software LLC. | $0.00 |
| 219. | Agreement for service for Cisco 2811 router, with CDW Computer Centers, Inc. | $0.00 |
| 220. | Agreement for local and long distance telephone service at 30 Bridges Rd., Rouses Point, New York, with Champlain Telephone Company. | $0.00 |
| 221. | Agreement for printer maintenance and supplies for 2020 Elmwood Avenue, Buffalo, with Checkpoint Systems, Inc. | $0.00 |
| 222. | Agreement for support for MarkMagic, with Cybra Corporation. | $0.00 |
| 223. | Agreement for paging system for AS/400, with DDL Systems Consulting, Inc. | $0.00 |
| 224. | Prepaid warranty service on PCs and laptops at 101 N. Wacker Drive, Chicago, Illinois, with Dell Marketing LP c/o Dell USA LP. | $0.00 |
| 225. | Agreement for maintenance for Open Plan software, with Deltek, Inc. | $0.00 |
| 226. | Agreement for maintenance for Kyocera copiers at 101 N. Wacker Drive, Chicago, Illinois, with Des Plaines Office Equipment Company. | $0.00 |
| 227. | Agreement for backup internet service at 101 N. Wacker Drive, Chicago, Illinois, with Globalcom, Inc. | $0.00 |
| 228. | Agreement for hosting services re hartschaffnermarx.com, with Hostway Corporation. | $0.00 |
| 229. | Agreement for support for optical character recognition system at 1155 N. Clinton Avenue, Rochester, with IKON Office Solutions, Inc. | $0.00 |

Doc. # CC-208531 v.1

| | Agreement Description | Cure Amount |
|---|---|---|
| 230. | Agreement for off site data storage, with Iron Mountain. | $0.00 |
| 231. | Statement of Work dated July 15, 2008 re ERP warehouse between JSC Global Solutions, Inc. and Hartmarx (for Hart Schaffner & Marx) | $0.00 |
| 232. | Agreement for maintenance for printers at 610 Uhler Road, Easton, Pennsylvania, with Lehigh Valley Business Machines. | $0.00 |
| 233. | As-needed server maintenance at 101 N. Wacker Drive, Chicago, Illinois, with LME Services. | $0.00 |
| 234. | Agreement for Internet and telecommunications services at 101 N. Wacker Drive, Chicago, Illinois and 1700 Touhy Ave., Des Plaines, Illinois, and 5000 S. Ohio, Michigan City, with Matrix. | $0.00 |
| 235. | Prepaid COBOL license and support, with Micro Focus US, Inc. | $0.00 |
| 236. | Letter of agreement, dated April 29, 2009, re Microsoft Dynamics NAV Business Ready software, with Microsoft Corporation. | $0.00 |
| 237. | Agreement for offsite data storage, with Mini Storage Depot. | $0.00 |
| 238. | System Management Consulting Agreement dated December 1, 2008 between MS Consulting Services, Inc. and Hartmarx Corporation. | $0.00 |
| 239. | Agreement for email SPAM filtering services, with MX Logic, Inc. | $0.00 |
| 240. | Agreement for maintenance for air conditioning in data center, with Northtown Mechanical Services. | $0.00 |
| 241. | Lease agreement for Kyocera copiers at 101 N. Wacker Drive, Chicago, Illinois, with Office Equipment Leasing Co / Great America. | $0.00 |
| 242. | Agreement for internet service at 202 Elmwood Avenue, Buffalo, with One Communications. | $0.00 |
| 243. | Prepaid Oracle software license and support at 101 N. Wacker Drive, Chicago, Illinois, with Oracle USA, Inc. | $0.00 |
| 244. | Agreement for professional services re EDI and Alliance AS2 Integrator Software, with Patrick Townsend & Associates. | $0.00 |

Doc. # CC-208531 v.1